UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RODELL SANDERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF CHICAGO HEIGHTS, JEFFREY | ) |
| BOHLEN, SAM MANGIALARDI, ROBERT PINNOW, | ) |
| MAUREEN TEED, CHARLES NARDONI, ANTHONY | ) |
| MURPHY, JOSEPH RUBESTELLI, DETECTIVE J. | ) |
| STAR # D78, and UNIDENTIFIED EMPLOYEES | ) |
| OF THE CITY OF CHICAGO HEIGHTS, | ) JURY TRIAL DEMANDED |
| | ) |
| Defendants. | ) |

## COMPLAINT

NOW COMES Plaintiff, RODELL SANDERS, by his attorneys, LOEVY & LOEVY, and complaining of Defendants, JEFFREY BOHLEN, SAM MANGIALARDI, ROBERT PINNOW, CHARLES NARDONI, ANTHONY MURPHY, JOSEPH RUBESTELLI, DETECTIVE J. STAR #D78, and UNIDENTIFIED EMPLOYEES of the CITY OF CHICAGO HEIGHTS, acting pursuant to the City's policies and practices (collectively, "Defendant Officers"), Federal Bureau of Investigation ("FBI") Agent MAUREEN TEED and the CITY OF CHICAGO HEIGHTS (hereinafter "City"), alleges as follows:

## Introduction

1.   For the past 19 years, Rodell Sanders has remained wrongfully imprisoned for a murder he did not commit.

2.   There was no physical evidence linking Mr. Sanders to this crime.  Rather, the only purported evidence against Mr. Sanders were two purchased and patently false witness identifications.   These wrongful misidentifications were procured through manipulation and bribes by members of the City of Chicago Heights's infamously corrupt police department.

3.   Unfortunately, the widespread misconduct that caused Mr. Sanders' wrongful conviction was not an isolated event. Prior to Mr. Sanders' unlawful prosecution, other individuals were unlawfully arrested by the same group of Chicago Heights Police Detectives, led by Defendants Jeffrey Bohlen, Robert Pinnow and their former Chief, Defendant Sam Mangialardi, a man who has since been convicted of racketeering, witness tampering, bribery, extortion, and money laundering.

4.   Although Mr. Sanders' conviction has been reversed, he will never regain the lost decades of his life.  This lawsuit seeks redress for his injuries.

## Jurisdiction and Venue

5.   This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

6. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28. U.S.C. § 1391(b). A number of the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

**The Parties**

7. Plaintiff Rodell Sanders is 48 years-old. Mr. Sanders was born and raised in Chicago Heights. He has two daughters. When he was wrongfully imprisoned, his oldest daughter was 13 years-old and his youngest was not yet born. Both daughters grew up without having a father in her life as a result of Mr. Sanders' wrongful incarceration.

8. Apart from the wrongful conviction that is the subject of this lawsuit, Mr. Sanders has no other criminal convictions. Moreover, although he has spent the past two decades incarcerated for a crime that he did not commit, Mr. Sanders has sought to better himself while in prison, earning a law clerk certificate and never having been put in segregation or been involved in a physical confrontation with officers or inmates.

9. Defendant City of Chicago Heights is an Illinois municipal corporation, and is and/or was the employer of Defendants Magnliardi, Bohlen and Pinnow. The City of Chicago Heights is responsible for the acts of the Defendant Officers

while employed by the City of Chicago Heights and while acting within the scope of their employment.

10.  At all times relevant hereto, Defendants Jeffrey Bohlen, Robert Pinnow, and Sam Mangialardi were police officers in the Chicago Heights Police Department acting under color of law and within the scope of their employment for the City of Chicago Heights.

11.  Defendant Maureen Teed is or was employed by the Federal Bureau of Investigation.  At all times relevant hereto, Defendant Teed was an agent with the FBI, acting under color of law and within the scope of her employment.

### The Shooting

12.  On December 15, 1993, Stacy Armstrong and Phillip Atkins were sleeping in a parked car around two in the morning. After being abruptly awoken, Ms. Armstrong and Mr. Atkins were accosted by a group of men and led to an abandoned garage.

13.  The garage was so dark that the offenders used a lighter to carry out the robbery and shooting that followed.

14.  Mr. Atkins was killed and Ms. Armstrong was shot multiple times and left for dead.  Ms. Armstrong blacked out after being shot.  Once she regained consciousness, Ms. Armstrong sought help by going to a nearby house and she was taken to the hospital.  Ms. Armstrong survived the shooting.

4

**Plaintiff's Innocence**

15.  Mr. Sanders had absolutely nothing to do with the crime.

16.  At the time of the shooting, Mr. Sanders was nowhere nearby.  Rather, Mr. Sanders was at his friend Vicky Ross's apartment.  According to Ms. Ross and many others, Mr. Sanders was playing cards and hanging out with them at all relevant times on the night of December 14, 1993.  The alibi witnesses recall that Mr. Sanders stayed at the apartment into the early morning hours of the following day.

**Defendants' Misconduct**

17.  There was never any physical evidence linking Mr. Sanders to this crime.  None of his fingerprints or DNA were found at the crime scene, nor was any incriminating evidence of any kind ever discovered in his possession.

18.  Defendants Bohlen and Pinnow knew Mr. Sanders and bore a grudge against him.  Despite the lack of evidence against him, the Defendants unlawfully pinned the shootings on Mr. Sanders.

17.  The Defendants first spoke with Ms. Armstrong at the hospital on the night of the shooting.  However, Ms. Armstrong's fragile condition prevented her from having anything more than a brief conversation with the Defendants at that time.

18.  After a couple of weeks, Defendants Bohlen and Pinnow interviewed Ms. Armstrong again.  During this subsequent

interview, Ms. Armstrong gave the Defendants a detailed account of the shooting.

19.   In particular, Ms. Armstrong informed Defendants Bohlen and Pinnow that four people committed the crime.  She could not identify the first and the fourth offenders, whom she described only as black men who acted as lookouts.

20.   Ms. Armstrong, however, gave the Defendants a detailed description of the shooter and the individual who ordered the shooting.

21.   As to the shooter, Ms. Armstrong informed Defendants Pinnow and Bohlen that he was a 16 year-old, short black male (between five feet, five inches and five feet, seven inches) with a medium build and medium complexion who was wearing a black shirt with a black hood and black pants.

22.   Ms. Armstrong further told the Defendants that the man who ordered the shooting (who will be hereafter referred to alternatively as Offender Number Three) was a man named Germaine Haslett.  She described him as a 30-year old, taller (approximately six feet) and skinny black man who was wearing black and grey faded pants and an olive, knit ski cap.

23.   The Defendants were already well acquainted with Mr. Haslett.  He had been working as their snitch in another Chicago Heights prosecution against a man named Bernard Ellis.  Although the Ellis prosecution later fell apart when the courts learned

6

that the police had provided undisclosed benefits to the State witnesses, at the time of the investigation into the Atkins and Armstrong shooting, Mr. Haslett was an important witness for the Defendants.

24. Because the Defendants were focused on protecting Mr. Haslett, the Defendants withheld Ms. Armstrong's identification of Mr. Haslett by name. Accordingly, the Defendants never memorialized in any police report or otherwise communicated to Mr. Sanders that Ms. Armstrong initially identified Mr. Haslett by name.

25. Thereafter, the Defendants sought to minimize Mr. Haslett's complicity in the crime by finding someone else to take his place as Offender Number Three, namely Mr. Sanders.

26. At the time of the shooting, Mr. Sanders stood five feet eight inches tall, weighed close to 200 pounds, and was 30 years old. He did not match the description of Offender Number Three (a tall skinny guy) or that of the shooter (a sixteen year-old teenager). Nor did Mr. Sanders have anything whatsoever to do with this crime.

27. Because Mr. Sanders did not match Ms. Armstrong's description, the Defendants had to manipulate Ms. Armstrong into changing her identification of Offender Number Three from Mr. Haslett to Mr. Sanders.

28.  To accomplish the task of having Ms. Armstrong misidentify Mr. Sanders and not Mr. Haslett, the Defendants concocted a flawed photographic line-up designed to improperly implicate Mr. Sanders.  To begin, although Ms. Armstrong had described Offender Number Three as tall and skinny, the Defendants inserted the short and stocky Plaintiff into the photo line-up shown to Ms. Armstrong.  Furthermore, the Defendants inexplicably did not include tall and skinny Germaine Haslett's photograph in the photo line-up, despite Ms. Armstrong having previously identified Haslett as Offender Number Three.

29.  The Defendants used additional means to improperly influence Ms. Armstrong into picking Mr. Sanders' photograph out of the photo line-up.  Among other manipulation that was used, the Defendants arranged for Ms. Armstrong to be relocated out of state in exchange for her identification of Mr. Sanders. Neither that relocation nor any of the other manipulation to which Ms. Armstrong was subjected was ever disclosed to Mr. Sanders.

30.  As a result of the Defendants' unlawful conduct, Ms. Armstrong also identified Mr. Sanders in a subsequent live lineup.

**Mr. Sanders' Unlawful Arrest**

31.  Several weeks after the shooting, the Defendants arrested Mr. Sanders based on Armstrong's false identification.

8

32.  According to Defendant Pinnow, he arrested Mr. Sanders because he was aware of an "arrest card" that the Chicago Heights Police Department had issued for Mr. Sanders, although that arrest card was never produced during discovery or at the trial.  It remains missing to this day.

34.  At the police station, Mr. Sanders was interrogated. During that interrogation, and on all subsequent occasions, Mr. Sanders steadfastly maintained his innocence, denying that he had any knowledge or involvement in the crime.

35.  The Defendants also questioned Mr. Haslett about the shootings.  Unlike Mr. Sanders, Mr. Haslett confessed his involvement as Offender Number Three to the Defendants.  Indeed, since the morning of the shooting, Mr. Haslett has repeatedly confessed to having ordered the shooting of Mr. Atkins and Ms. Armstrong to family and friends.

36.  Although the Defendants knew that Mr. Haslett was guilty and Mr. Sanders was innocent of this crime, the Defendants endeavored to protect Mr. Haslett, their snitch whose testimony they needed for the other case.  They offered Mr. Haslett a deal – if he would falsely implicate Mr. Sanders as Offender Number Three, they would allow Mr. Haslett to paint himself as just one of the look-outs and give him a generous plea deal and a host of undisclosed benefits.

**Haslett's Undisclosed Benefits**

33.  Mr. Haslett agreed to participate in the illicit scheme.  In exchange for his false statement inculpating Mr. Sanders, Mr. Haslett received a deal on the Atkins and Armstrong case, allowing him to plead guilty to armed robbery instead of facing charges for murder and attempt murder.

34.  That, however, was not the only benefit that Mr. Haslett received.  Unbeknownst to Mr. Sanders, during the pendency of Mr. Sanders' case, Defendant Bohlen arranged for Mr. Haslett to continue his career as an FBI and Chicago Heights police informant, including by giving testimony against Mr. Sanders.  In doing so, Mr. Haslett was able to curry multiple additional, undisclosed favors for himself.

35.  First, in exchange for Haslett's testimony against Mr. Sanders, the Defendants agreed to terminate Mr. Haslett's probation in an unrelated drug case.  That consideration was never disclosed to Mr. Sanders or his defense.

36.  Second, the Defendants arranged for Mr. Haslett to receive a two-year reduction on the 12-year sentence he was given as part of his plea in the Atkins and Armstrong case.  As a result, Mr. Haslett served less than five years in prison.  In addition, the Defendants ensured that Mr. Haslett was housed during those five years in the witness quarters in the State's Attorney's Office, protective custody at the Cook County Jail or

in the federal system. The reduction in Mr. Haslett's sentence and his preferred housing while incarcerated were both withheld from Mr. Sanders and his defense.

37. Third, the Defendants (including Maureen Teed) helped arrange for thousands of dollars to be paid to Mr. Haslett and his-then girlfriend and the mother of his children in exchange for Mr. Haslett's testimony against Sanders.

38. None of the payments to Mr. Haslett or his girlfriend were ever disclosed to Mr. Sanders or his defense attorney.

## The Wrongful Conviction

39. At trial, the only evidence introduced against Mr. Sanders were the false identifications by Ms. Armstrong and Mr. Haslett. All other evidence, including the physical evidence collected by the Defendants, exculpated Mr. Sanders.

40. Nevertheless, on the basis of the false identifications procured by Defendants, the jury convicted Mr. Sanders of attempt murder, armed robbery and murder.

41. Mr. Sanders was then sentenced to 55 years of incarceration for the murder and 25 years of incarceration for the attempt murder to run consecutively. In addition, Mr. Sanders was sentenced to a concurrent 20 years of imprisonment on the armed robbery charge.

**Plaintiff's Exoneration**

42.  Mr. Sanders fought tirelessly to overturn his wrongful conviction.  After almost two decades of incarceration, Rodell Sanders' unjust conviction was finally vacated on January 14, 2011.

43.  The Circuit Court's ruling overturning Mr. Sanders' conviction and vacating his sentence was affirmed by the Illinois Court of Appeals on May 30, 2012.

**Chicago Heights' Pattern of Misconduct**

44.  The misconduct that caused Mr. Sanders' wrongful conviction was not an isolated event.  Rather, the Chicago Heights Police Department has a storied history of police misconduct.

45.  Most notably, in 1993, Defendant Mangialardi was arrested and charged with racketeering, witness tampering, and extortion.  A year later he was convicted of those charges, and was sentenced to over a decade in prison.

46.  The arrest, trial, and conviction of Defendant Mangialardi centered on Defendant Mangialardi's extortion of Otis Moore, the leader of a flourishing drug ring.

47.  For a number of years, Defendant Mangialardi demanded that Mr. Moore pay him $10,000 per month.  In exchange, Defendant Mangialardi diverted officers from Mr. Moore's drug

turf and directed those officers to investigate Mr. Moore's competitors.

48. Yet, the corruption did not stop with Defendant Mangialardi's conviction. Rather, the misconduct in Chicago Heights was so widespread that a total of 6 police officers, and 15 public officials, including the former mayor, Charles Pinici, were convicted and sentenced to lengthy prison sentences and large fines.

49. The corruption was so widespread among the City of Chicago Heights police department that the Mayor enlisted a retired Illinois Supreme Court Justice to investigate the entire police department.

50. For instance, around the same time as Mr. Sanders was facing false charges for murder, Bernard Ellis was facing trial for murder. Ellis was eventually found guilty, but his conviction was reversed when the appellate court found that the very Defendants involved in Mr. Sanders' case had not disclosed benefits that were provided to two of the eyewitnesses to the shooting. Even more, the appellate court also found that the various Defendants coached, threatened, and bribed witnesses in exchange for false identifications of Ellis.

### Plaintiff's Injuries

51. In serving nearly two decades behind bars, Mr. Sanders has been, and continues to be, wrongfully deprived of much of

13

his adult life.  Mr. Sanders has been stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  He missed out on the ability to raise his daughters, share holidays, births, funerals, and other life events with loved ones, and the fundamental freedom to live one's life as an autonomous human being.

52.  As a result of his wrongful incarceration, Mr. Sanders must now attempt to rebuild his life, all without the benefit of the life experiences that ordinarily equip adults for that task.

### Count I – Due Process

### 42 U.S.C. § 1983

53.  Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

54.  As described more fully above, the Defendant Officers, while acting individually, jointly, and in conspiracy with other named and unnamed individuals, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

55.  In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence, and fabricated false reports and other evidence, thereby misleading and misdirecting the criminal prosecution of

Plaintiff. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

56. The Defendant Officers' misconduct also directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional right to a fair trial, and a fair appeal thereof, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

57. As a result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

58. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

59. The misconduct by the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Chicago Heights Police Department in that Mr. Sanders was the victim of, and his injuries were proximately caused by, a policy and practice on the part of the City of Chicago Heights to pursue and secure false convictions through profoundly flawed investigations.

60. Specifically, throughout the 1990s, a group of Chicago Police Heights Officers, including some or all of the Defendant Officers herein, engaged in a systematic pattern of coercion,

fabrication of evidence, withholding of exculpatory information, and other illegal tactics, the sum total of which completely corrupted the investigative process.

61. This institutional desire to close cases through unconstitutional tactics regardless of actual guilt or innocence, in order to enhance police officers' personal standing in the Department, was known to the command personnel, who themselves participated in the practice.

62. The above-described widespread practices, so well-settled as to constitute *de facto* policy in the Chicago Heights Police Department during the time period at issue, were able to exist and thrive because municipal policymakers with authority over the same either concurred with the practices or exhibited deliberate indifference to the problem.

63. The widespread practices described in the preceding paragraphs were allowed to take place because the City declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment. Indeed, the Department's system for investigating and disciplining police officers accused of the type of misconduct that befell Plaintiff was, and is, for all practical purposes, nonexistent.

64. Chicago Heights police officers who manufactured criminal cases against individuals such as Plaintiff had every reason to know that they not only enjoyed *de facto* immunity from

16

criminal prosecution and/or Departmental discipline, but that they also stood to be rewarded for closing cases no matter what the costs.  In this way, this system proximately caused abuses, such as the Defendant Officers' misconduct at issue in this case.

### Count II Due Process

### *Bivens v. Six Unknown Named Agents of the FBI*, 403 U.S. 388 (1971)

65.  Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

66.  As described more fully above, Defendant Teed, while acting individually, jointly, and in conspiracy with other named and unnamed individuals, as well as under color of law and within the scope of her employment, deprived Plaintiff of his constitutional right to a fair trial.

67.  In the manner described more fully above, Defendant Teed deliberately withheld exculpatory evidence, and fabricated false reports and other evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.  Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

68.  Defendant Teed's misconduct also directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional right to a fair trial, and a fair appeal

thereof, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

69. As a result of this violation of his constitutional right to a fair trial, Plaintiff was injured, including, but not limited to, emotional distress, as is more fully alleged above.

70. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

### Count III - Conspiracy

### 42 U.S.C. § 1983

71. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

72. Prior to arresting Plaintiff, the Defendant Officers reached an agreement amongst themselves to frame Plaintiff for the crime, and to thereby deprive Plaintiff of his constitutional rights, all as described in the various Paragraphs of this Complaint.

73. In addition, before and after Plaintiff's conviction, each of the Defendant Officers further conspired, and continue to conspire, to deprive Plaintiff of exculpatory materials to which he was lawfully entitled and which would have led to his more timely exoneration of the false charges as described in the various Paragraphs of this Complaint.

18

74. In this manner, the Defendant Officers, acting in concert with each other and with Defendant Teed and other unknown co-conspirators, including persons who are and who are not members of the Chicago Heights Police Department or FBI, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

75. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

76. As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

77. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

78. The Defendant Officers' misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Heights Police Department in the manner described more fully in preceding paragraphs, and was tacitly ratified by policy-makers for the City of Chicago Heights with final policymaking authority.

### Count IV - Conspiracy

### *Bivens v. Six Unknown Named Agents of the FBI*, 403 U.S. 388 (1971)

79.  Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

80.  Prior to arresting Plaintiff, Defendant Teed reached an agreement with the other Defendants to frame Plaintiff for the crime, and to thereby deprive Plaintiff of his constitutional rights, all as described in the various Paragraphs of this Complaint.

81.  In addition, before and after Plaintiff's conviction, Defendant Teed further conspired, and continues to conspire, to deprive Plaintiff of exculpatory materials to which he was lawfully entitled and which would have led to his more timely exoneration of the false charges as described in the various Paragraphs of this Complaint.

82.  In this manner, Defendant Teed, acting in concert with the other Defendants and other unknown co-conspirators, including persons who are and who are not members of the Chicago Heights Police Department or FBI, has conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

83.  In furtherance of the conspiracy, Defendant Teed committed overt acts and was an otherwise willful participant in joint activity.

84.  As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

85.  The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

### Count V - Failure to Intervene

### 42 U.S.C. § 1983

86.  Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

87.  In the manner described above, during the Constitutional violations described above, one or more of the Defendant Officers (including as-yet-unknown Police Officers) stood by without intervening to prevent the misconduct.

88.  As a result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress.  These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

89.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

90.   The Defendant Officers' misconduct described in this Count was undertaken pursuant to Chicago Height's policy and practice in the manner described in preceding paragraphs.

### Count VI - Failure to Intervene

### *Bivens v. Six Unknown Named Agents of the FBI*, 403 U.S. 388 (1971)

91.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

92.   In the manner described above, during the constitutional violations described above, Defendant Teed stood by without intervening to prevent the misconduct.

93.   As a result of Defendant Teed's failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress.  Defendant Teed had a reasonable opportunity to prevent this harm, but failed to do so.

94.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

### Count V - Supervisor Liability

### 42 U.S.C. § 1983

95.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

96. The constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct, which occurred with the knowledge and consent of those of the Defendant Officers who acted in a supervisory capacity, including Defendants Mangialardi, Nardoni, Murphy, and Rubestelli, such that these officers personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or least recklessly caused the alleged deprivation by their actions or by their deliberately indifferent failure to act.

97. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

98. The misconduct described in this Count was undertaken pursuant to the City's policy and practice in the manner more fully described above.

99. As a result of this violation, Plaintiff suffered injuries, including but not limited to emotional distress, as is more fully alleged above.

100. Absent knowing participation by the command personnel responsible for supervising the Defendant Officers, the misconduct alleged in this Complaint could not have occurred.

WHEREFORE, Plaintiff, RODELL SANDERS, respectfully requests that this Court enter judgment in his favor and against Defendants, CITY OF CHICAGO HEIGHTS, MAUREEN TEED, JEFFREY BOHLEN, ROBERT PINNOW, SAM MANGIALARDI, Det. J. CHARLES NARDONI, ANTHONY MURPHY, JOSEPH RUBESTELLI, DETECTIVE J. STAR #D78, and UNIDENTIFIED EMPLOYEES of the CITY OF CHICAGO HEIGHTS, awarding compensatory damages, costs, and attorneys' fees, as well as punitive damages against all individual defendants, and any other relief this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff, RODELL SANDERS, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:


s/ Gayle Horn
Attorneys for Rodell Sanders


Arthur Loevy
Jon Loevy
Michael Kanovitz
Russell Ainsworth
Gayle Horn
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900