UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RODELL SANDERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 13-CV-221 |
| v. ) | |
| ) | |
| CITY OF CHICAGO HEIGHTS, JEFFREY ) | Judge St. Eve |
| BOHLEN, SAM MANGIALARDI, ROBERT PINNOW, ) | |
| MAUREEN TEED, CHARLES NARDONI, ANTHONY ) | |
| MURPHY, JOSEPH RUBESTELLI, DETECTIVE J. ) | |
| STAR # D78, and UNIDENTIFIED EMPLOYEES ) | |
| OF THE CITY OF CHICAGO HEIGHTS, ) | JURY TRIAL DEMANDED |
| ) | |
| Defendants. ) | |

**FIRST AMENDED COMPLAINT**

NOW COMES Plaintiff, RODELL SANDERS, by his attorneys, LOEVY & LOEVY, and complaining of Defendants, JEFFREY BOHLEN, SAM MANGIALARDI, ROBERT PINNOW, CHARLES NARDONI, ANTHONY MURPHY, JOSEPH RUBESTELLI, DETECTIVE J. STAR #D78, and UNIDENTIFIED EMPLOYEES of the CITY OF CHICAGO HEIGHTS, acting pursuant to the City's policies and practices (collectively, "Defendant Officers"), Federal Bureau of Investigation ("FBI") Agent MAUREEN TEED and the CITY OF CHICAGO HEIGHTS (hereinafter "City"), alleges as follows:

**Introduction**

1.    Rodell Sanders spent more than 20 years incarcerated for a murder and attempt murder that he did not commit.

2.    There was no physical evidence linking Mr. Sanders to this crime.  Rather, the only purported evidence against Mr. Sanders were two purchased and patently false witness identifications.  These wrongful misidentifications were procured through manipulation and bribes by members of the City of Chicago Heights's infamously corrupt police department.

3.    Unfortunately, the widespread misconduct that caused Mr. Sanders' wrongful conviction was not an isolated event. Prior to Mr. Sanders' unlawful prosecution, other individuals were unlawfully arrested by the same group of Chicago Heights Police Detectives, led by Defendants Jeffrey Bohlen, Robert Pinnow and their former Chief, Defendant Sam Mangialardi, a man who has since been convicted of racketeering, witness tampering, bribery, extortion, and money laundering.

4.    Although Mr. Sanders' has been acquitted of all the false charges lodged by Defendants, he will never regain the lost decades of his life.  This lawsuit seeks redress for his injuries.

**Jurisdiction and Venue**

5.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights

as secured by the United States Constitution.

6.    This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.  Venue is proper under 28. U.S.C. § 1391(b).  A number of the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

**The Parties**

7.    Plaintiff Rodell Sanders is 49 years old.  Mr. Sanders has two daughters.  When he was wrongfully imprisoned, his oldest daughter was 13 years old and his youngest was not yet born.  Both daughters grew up without having a father in their lives as a result of Mr. Sanders' wrongful incarceration.

8.    Apart from the wrongful conviction that is the subject of this lawsuit, Mr. Sanders has no other criminal convictions. Moreover, although he spent the past two decades incarcerated for a crime that he did not commit, Mr. Sanders sought to better himself while in prison, earning a law clerk certificate and never having been put in segregation.

9.    Defendant City of Chicago Heights is an Illinois municipal corporation, and is and/or was the employer of Defendants Mangialardi, Bohlen, Pinnow, J. Star #D78, Nardoni, Murphy and Rubestelli.  The City of Chicago Heights is responsible for the acts of the Defendant Officers while

employed by the City of Chicago Heights and while acting within the scope of their employment.

10.  At all times relevant hereto, Defendants Mangialardi, Pinnow, Bohlen, J. Star #D78, Murphy and Rubestelli were police officers in the Chicago Heights Police Department acting under color of law and within the scope of their employment for the City of Chicago Heights.

11.  Defendant Maureen Teed is or was employed by the Federal Bureau of Investigation.  At all times relevant hereto, Defendant Teed was an agent with the FBI, acting under color of law and within the scope of her employment.

### The Shooting

12.  On December 15, 1993, Stacy Armstrong and Phillip Atkins were sitting in a parked car around two in the morning. After being abruptly awoken, Ms. Armstrong and Mr. Atkins were accosted by a group of men and led to an abandoned garage.

13.  The garage was so dark that the offenders used a lighter to carry out the robbery and shooting that followed.

14.  Mr. Atkins was killed and Ms. Armstrong was shot multiple times and left for dead.  Ms. Armstrong blacked out after being shot.  Once she regained consciousness, Ms. Armstrong sought help by going to a nearby house and was eventually taken to the hospital.  Ms. Armstrong survived the shooting.

**Plaintiff's Innocence**

15.  Mr. Sanders had absolutely nothing to do with the crime.

16.  At the time of the shooting, Mr. Sanders was nowhere nearby.  Rather, Mr. Sanders was at his friend Vicky Ross's apartment.  According to Ms. Ross and many others, Mr. Sanders was playing cards and hanging out with them at all relevant times on the night of December 14, 1993.  The alibi witnesses recall that Mr. Sanders stayed at the apartment into the early morning hours of the following day.

**Defendants' Misconduct**

17.  There was never any physical evidence linking Mr. Sanders to this crime.  None of his fingerprints or DNA were found at the crime scene, nor was any incriminating evidence of any kind ever discovered in his possession.

18.  Defendants Bohlen and Pinnow knew Mr. Sanders and bore a grudge against him.  Despite the lack of evidence against Mr. Sanders, the Defendants unlawfully pinned the shootings on him.

17.  The Defendants first spoke with Ms. Armstrong at the hospital on the night of the shooting.  However, Ms. Armstrong was unable to describe the offenders at all at that time.

18.  Two weeks later, Defendants Bohlen and Pinnow interviewed Ms. Armstrong again.  During this subsequent interview, Ms. Armstrong gave the Defendants a detailed account

of the shooting.

19. According to the Defendants, Ms. Armstrong related that four people committed the crime. She could not identify the first and the fourth offenders, whom she described only as black men.

20. Ms. Armstrong, however, described the shooter and the individual who ordered the shooting.

21. As to the shooter, Ms. Armstrong informed Defendants Pinnow and Bohlen that he was a 16 year-old, short black male (between five feet, five inches and five feet, seven inches tall) with a medium build and medium complexion who was wearing a black shirt with a black hood and black pants.

22. Ms. Armstrong further told the Defendants that the man who ordered the shooting (who will be hereinafter referred to alternatively as Offender Number Three) was a six foot tall skinny black man who was wearing black and grey faded pants and an olive, knit ski cap in his thirties. Ms. Armstrong told the Defendants that Offender Number Three had a mustache and goatee.

23. At the time of the shooting, Mr. Sanders stood five feet eight inches tall and weighed close to 200 pounds, and was 29 years old. He did not match the description of Offender Number Three (a tall skinny guy) or that of the shooter (a sixteen year-old teenager). Nor did Mr. Sanders have anything whatsoever to do with this crime.

6

24. Although the Defendants knew that Rodell Sanders was not Offender Number Three, the Defendants manipulated Ms. Armstrong into identifying Mr. Sanders as Offender Number Three.

25. To accomplish the task of having Ms. Armstrong misidentify Mr. Sanders, the Defendants concocted a flawed photographic line-up designed to improperly implicate Mr. Sanders. To begin, although Ms. Armstrong had described Offender Number Three as tall and skinny, the Defendants inserted Mr. Sanders into the photo array shown to Ms. Armstrong, despite the fact that Mr. Sanders was 5'8 and weighed close to 200 pounds. Among other misconduct, the Defendants manipulated Mr. Sanders' photograph to make him look taller and thinner than he truly was.

26. As a result of the Defendants' unlawful conduct, Ms. Armstrong also falsely identified Mr. Sanders in a subsequent live lineup.

27. The Defendants never disclosed to Mr. Sanders or his attorneys the means by which they manipulated Ms. Armstrong into identifying him.

28. Thereafter, according to Defendants, they arrested Germaine Haslett, an acquaintance of Mr. Sanders, in January 1994 on an unrelated crime. The Defendants were already well acquainted with Haslett. He had been cooperating with the Chicago Heights Police Department against a man named Bernard

7

Ellis.  Although the Ellis prosecution later fell apart when the courts learned that the police had been withholding exculpatory evidence from Ellis, at the time of the investigation into the Atkins and Armstrong shooting, Haslett was an important witness for the Defendants.

29.  On the day of his arrest, Haslett confessed to Defendants his role in the Atkins murder – namely, that he was Offender Number Three.

30.  To protect Haslett, their main witness against the Ellis, the Defendants sought to minimize Haslett's complicity in the crime by permitting him to claim he was simply a lookout in exchange for falsely pointing the finger at Mr. Sanders.

### Haslett's Undisclosed Benefits

31.  Mr. Haslett agreed to participate in the illicit scheme.  In exchange for his false statement inculpating Mr. Sanders, Haslett received a deal on the Atkins and Armstrong case, allowing him to plead guilty to armed robbery instead of facing charges for murder and attempt murder.

32.  That, however, was not the only benefit that Haslett received.  Unbeknownst to Mr. Sanders, during the pendency of Mr. Sanders' case, Defendant Bohlen arranged for Haslett to continue his career as an FBI and Chicago Heights police informant, including by giving testimony against Mr. Sanders.

In doing so, Haslett was able to curry multiple additional, undisclosed favors for himself.

33.  First, in exchange for Haslett's testimony against Mr. Sanders, the Defendants agreed to terminate Haslett's probation in an unrelated drug case.  That consideration was never disclosed to Mr. Sanders or his defense prior to his wrongful incarceration.

34.  Second, the Defendants arranged for Haslett to receive a two-year reduction on the 12-year sentence he was given as part of his plea in the Atkins and Armstrong case.  As a result, Haslett served just five and a half years in prison.  In addition, the Defendants ensured that Haslett was housed during those five years in the witness quarters in the State's Attorney's Office, protective custody at the Cook County Jail or in the federal system.  The reduction in Haslett's sentence and his preferred housing while incarcerated were both withheld from Mr. Sanders and his defense.

35.  Third, the Defendants (including Maureen Teed) helped arrange for thousands of dollars to be paid to Haslett and his-then girlfriend and the mother of his children in exchange for Haslett's testimony against Sanders.  They also arranged for Haslett and his then-girlfriend to have unsupervised visits.

36.  None of the payments to Haslett or his girlfriend or the visits they were permitted to have were disclosed to Mr.

Sanders or his defense prior to his wrongful conviction.

## The Wrongful Conviction

37.  At his first trial, the only evidence introduced against Mr. Sanders were the false identifications by Ms. Armstrong and Mr. Haslett.  All other evidence, including the physical evidence collected by the Defendants, exculpated Mr. Sanders.

38.  Nevertheless, on the basis of the false identifications procured by Defendants, the jury convicted Mr. Sanders of attempt murder, armed robbery and murder.

39.  Mr. Sanders was then sentenced to 80 years of incarceration for the murder attempt murder.  In addition, Mr. Sanders was sentenced to a concurrent 20 years of imprisonment on the armed robbery charge.

## Plaintiff's Exoneration

40.  Mr. Sanders fought tirelessly to overturn his wrongful conviction.  After almost two decades of incarceration, Rodell Sanders' unjust conviction was finally vacated on January 14, 2011.

41.  Remarkably, Mr. Sanders spent years learning the law and obtaining evidence via Freedom of Information Act requests and ordering transcripts that directly led to his exoneration. Despite only a high school education, Mr. Sanders litigated his

post-conviction claims *pro se* and convinced a court to overturn his conviction.

42. The Illinois Court of Appeals affirmed the Circuit Court's ruling overturning Mr. Sanders' conviction and vacating his sentence on May 30, 2012.

43. Mr. Sanders was then retried. On July 22, 2014, a jury acquitted Mr. Sanders of all the charges against him.

### Chicago Heights' Pattern of Misconduct

44. The misconduct that caused Mr. Sanders' wrongful conviction was not an isolated event. Rather, the Chicago Heights Police Department has a storied history of police misconduct.

45. Most notably, in 1993, Defendant Mangialardi was arrested and charged with racketeering, witness tampering, and extortion. A year later he was convicted of those charges, and was sentenced to over a decade in prison.

46. The arrest, trial, and conviction of Defendant Mangialardi centered on Defendant Mangialardi's extortion of Otis Moore, the leader of a flourishing drug ring.

47. For a number of years, Defendant Mangialardi demanded that Moore pay him $10,000 per month. In exchange, Defendant Mangialardi diverted officers from Moore's drug turf and directed those officers to investigate Moore's competitors.

11

48.  Yet, the corruption did not stop with Defendant Mangialardi's conviction.  Rather, the misconduct in Chicago Heights was so widespread that a total of six police officers, and 15 public officials, including the former mayor, Charles Pinici, were convicted and sentenced to lengthy prison sentences and large fines.

49.  The corruption was so widespread among the City of Chicago Heights police department that the Mayor enlisted a retired Illinois Supreme Court Justice to investigate the entire police department.

50.  For instance, around the same time as Mr. Sanders was facing false charges for murder, Bernard Ellis was facing trial for murder.  Ellis was eventually found guilty, but his conviction was reversed when the appellate court found that the very Defendants involved in Mr. Sanders' case had not disclosed benefits that were provided to two of the eyewitnesses to the shooting.  Even more, the appellate court also found that the various Defendants coached, threatened, and bribed witnesses in exchange for false identifications of Ellis.

### Plaintiff's Injuries

51.  In serving two decades behind bars, Mr. Sanders was wrongfully deprived of much of his adult life.  Mr. Sanders has been stripped of the various pleasures of basic human experience, from the simplest to the most important, which all

free people enjoy as a matter of right. He missed out on the ability to raise his daughters, share holidays, births, funerals, and other life events with loved ones, and the fundamental freedom to live one's life as an autonomous human being.

52. As a result of his wrongful incarceration, Mr. Sanders must now attempt to rebuild his life, all without the benefit of the life experiences that ordinarily equip adults for that task.

## Count I – Due Process

## 42 U.S.C. § 1983

53. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

54. As described more fully above, the Defendant Officers, while acting individually, jointly, and in conspiracy with other named and unnamed individuals, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

55. In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence, and fabricated false reports and other evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

13

56. The Defendant Officers' misconduct also directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional right to a fair trial, and a fair appeal thereof, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

57. As a result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including, but not limited to, physical sickness and injury, and emotional distress, as is more fully alleged above.

58. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

59. The misconduct by the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Chicago Heights Police Department, which Mr. Sanders was the victim of, and his injuries were proximately caused by a policy and practice on the part of the City of Chicago Heights to pursue and secure false convictions through profoundly flawed investigations.

60. Specifically, throughout the 1990s, a group of Chicago Police Heights Officers, including some or all of the Defendant Officers herein, engaged in a systematic pattern of coercion, fabrication of evidence, withholding of exculpatory information,

and other illegal tactics, the sum total of which completely corrupted the investigative process.

61.  This institutional desire to close cases through unconstitutional tactics regardless of actual guilt or innocence, in order to enhance police officers' personal standing in the Department, was known to the command personnel, who themselves participated in the practice.

62.  The above-described widespread practices, so well-settled as to constitute *de facto* policy in the Chicago Heights Police Department during the time period at issue, were able to exist and thrive because municipal policymakers with authority over the same either concurred with the practices or exhibited deliberate indifference to the problem.

63.  The widespread practices described in the preceding paragraphs were allowed to take place because the City declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment.  Indeed, the Department's system for investigating and disciplining police officers accused of the type of misconduct that befell Plaintiff was, and is, for all practical purposes, nonexistent.

64.  Chicago Heights police officers who manufactured criminal cases against individuals such as Plaintiff had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and/or Departmental discipline, but that

15

they also stood to be rewarded for closing cases no matter what the costs.  In this way, this system proximately caused abuses, such as the Defendant Officers' misconduct at issue in this case.

### Count II Due Process

### *Bivens v. Six Unknown Named Agents of the FBI*, 403 U.S. 388 (1971)

65.  Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

66.  As described more fully above, Defendant Teed, while acting individually, jointly, and in conspiracy with other named and unnamed individuals, as well as under color of law and within the scope of her employment, deprived Plaintiff of his constitutional right to a fair trial.

67.  In the manner described more fully above, Defendant Teed deliberately withheld exculpatory evidence, and fabricated false reports and other evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.  Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

68.  Defendant Teed's misconduct also directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional right to a fair trial, and a fair appeal

16

thereof, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

69.  As a result of this violation of his constitutional right to a fair trial, Plaintiff was injured, including, but not limited to, physical injury and sickness, and emotional distress, as is more fully alleged above.

70.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

### Count III - Conspiracy

### 42 U.S.C. § 1983

71.  Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

72.  Prior to arresting Plaintiff, the Defendant Officers reached an agreement amongst themselves to frame Plaintiff for the crime, and to thereby deprive Plaintiff of his constitutional rights, all as described in the various Paragraphs of this Complaint.

73.  In addition, before and after Plaintiff's conviction, each of the Defendant Officers further conspired, and continue to conspire, to deprive Plaintiff of exculpatory materials to which he was lawfully entitled and which would have led to his more timely exoneration of the false charges as described in the various Paragraphs of this Complaint.

17

74.   In this manner, the Defendant Officers, acting in concert with each other and with Defendant Teed and other unknown co-conspirators, including persons who are and who are not members of the Chicago Heights Police Department or FBI, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

75.   In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

76.   As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and he suffered financial damages, as well as physical injury and sickness, and severe emotional distress and anguish, as is more fully alleged above.

77.   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

78.   The Defendant Officers' misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Heights Police Department in the manner described more fully in preceding paragraphs, and was tacitly ratified by policy-makers for the City of Chicago Heights with final policymaking authority.

## Count IV - Conspiracy

### *Bivens v. Six Unknown Named Agents of the FBI*, 403 U.S. 388 (1971)

79. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

80. Prior to arresting Plaintiff, Defendant Teed reached an agreement with the other Defendants to frame Plaintiff for the crime, and to thereby deprive Plaintiff of his constitutional rights, all as described in the various Paragraphs of this Complaint.

81. In addition, before and after Plaintiff's conviction, Defendant Teed further conspired, and continues to conspire, to deprive Plaintiff of exculpatory materials to which he was lawfully entitled and which would have led to his more timely exoneration of the false charges as described in the various Paragraphs of this Complaint.

82. In this manner, Defendant Teed, acting in concert with the other Defendants and other unknown co-conspirators, including persons who are and who are not members of the Chicago Heights Police Department or FBI, has conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

83. In furtherance of the conspiracy, Defendant Teed committed overt acts and was an otherwise willful participant in joint activity.

84.  As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and he suffered financial damages, physical injury and sickness, as well as severe emotional distress and anguish, as is more fully alleged above.

85.  The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

### Count V - Failure to Intervene

### 42 U.S.C. § 1983

86.  Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

87.  In the manner described above, during the Constitutional violations described above, one or more of the Defendant Officers (including as-yet-unknown Police Officers) stood by without intervening to prevent the misconduct.

88.  As a result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered damages, including physical sickness and injury, as well as emotional distress.  These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

89.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful

indifference to Plaintiff's constitutional rights.

90.   The Defendant Officers' misconduct described in this
Count was undertaken pursuant to Chicago Height's policy and
practice in the manner described in preceding paragraphs.

### Count VI - Failure to Intervene

#### *Bivens v. Six Unknown Named Agents of the FBI*, 403 U.S. 388 (1971)

91.   Each of the Paragraphs of this Complaint is
incorporated as if restated fully herein.

92.   In the manner described above, during the
constitutional violations described above, Defendant Teed stood
by without intervening to prevent the misconduct.

93.   As a result of Defendant Teed's failure to intervene
to prevent the violation of Plaintiff's constitutional rights,
Plaintiff suffered damages, including physical sickness and
injury, as well as emotional distress.  Defendant Teed had a
reasonable opportunity to prevent this harm, but failed to do
so.

94.   The misconduct described in this Count was objectively
unreasonable and was undertaken intentionally with willful
indifference to Plaintiff's constitutional rights.

**Count VII – Supervisor Liability**

**42 U.S.C. § 1983**

95.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

96.   The constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct, which occurred with the knowledge and consent of those of the Defendant Officers who acted in a supervisory capacity, including Defendants Mangialardi, Nardoni, Murphy, and Rubestelli, such that these officers personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or least recklessly caused the alleged deprivation by their actions or by their deliberately indifferent failure to act.

97.   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

98.   The misconduct described in this Count was undertaken pursuant to the City's policy and practice in the manner more fully described above.

99.   As a result of this violation, Plaintiff suffered injuries, including but not limited to physical sickness and injuries, and emotional distress, as is more fully alleged above.

100. Absent knowing participation by the command personnel responsible for supervising the Defendant Officers, the misconduct alleged in this Complaint could not have occurred.

## Count VIII – Malicious Prosecution

### 42 U.S.C. § 1983[1]

101. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

102. Defendant Officers caused Plaintiff to be improperly subjected to judicial proceedings for which there was no legitimate probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of his innocence.

103. The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

104. Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. In so doing, the

---

[1] Plaintiff is including this claim in his First Amended Complaint to preserve it in the event that the Seventh Circuit overturns its ruling in *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001).

Defendant Officers fabricated evidence and withheld exculpatory information.

105. The misconduct in this Count violated Plaintiff's rights under the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

106. The misconduct described in this Court was undertaken with malice, willfulness, and reckless indifference to the rights of others.

107. The misconduct described in this Count was undertaken pursuant to the City's policy and practice in the manner more fully described above.

108. As a result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including physical injury and sickness, and emotional pain and suffering.

### Count IX – Malicious Prosecution

### *Bivens v. Six Unknown Named Agents of the FBI*, 403 U.S. 388 (1971)

109. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

110. Defendant Teed caused Plaintiff to be improperly subjected to judicial proceedings for which there was no legitimate probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and

all such proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of his innocence.

111. Defendant Teed accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

112. Statements of Defendant Teed regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured.  In so doing, the Defendant fabricated evidence and withheld exculpatory information.

113. The misconduct in this Count violated Plaintiff's rights under the Fourth Amendment and the procedural and substantive due process component of the Fourteenth Amendment.

114. The misconduct described in this Court was undertaken with malice, willfulness, and reckless indifference to the rights of others.

115. As a result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including physical injury and sickness, and emotional pain and suffering.

**Count X – State Law Claim**

**Malicious Prosecution**

116. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

117. Defendant Officers caused Plaintiff to be improperly subjected to judicial proceedings for which there was no legitimate probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of innocence.

118. Defendant Officers accused Plaintiff of criminal activities knowing those accusations to be without genuine probable cause, and made statements to the police and/or prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

119. Defendant Officers also fabricated evidence and failed to disclose the manner in which that evidence was fabricated. Additionally, the Defendant Officers withheld evidence that would have proven Plaintiff's innocence.

120. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

121. As a result of this misconduct, Plaintiff sustained injuries, including physical injury and sickness, and emotional pain and suffering, as more fully alleged above.

## Count XI -- State Law Claim

### Intentional Infliction of Emotional Distress

122. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

123. In the manner described more fully above, by wrongfully inculpating Plaintiff in a crime he did not commit, Defendant Officers intended to cause emotional distress.

124. In doing so, Defendant Officers' conduct was extreme and outrageous and caused Plaintiff severe, disabling emotional distress.

125. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

126. As a result of this misconduct, Plaintiff sustained injuries, including physical injury and sickness, and emotional pain and suffering, as is more fully alleged above.

## Count XII -- State Law Claim

### Respondeat Superior

127. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

128. In committing the acts alleged in the preceding paragraphs, Defendant Officers were members of the Chicago Police Department, acting at all relevant times within the scope of their employment.

129. Defendant City of Chicago is liable as the principal for all torts committed by its agents.

### Count XIII -- State Law Claim

### Indemnification

130. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

131. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

132. The Defendant Officers are or were employees of the Chicago Police Department, and acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, RODELL SANDERS, respectfully requests that this Court enter judgment in his favor and against Defendants, CITY OF CHICAGO HEIGHTS, MAUREEN TEED, JEFFREY BOHLEN, ROBERT PINNOW, SAM MANGIALARDI, Det. J. CHARLES NARDONI, ANTHONY MURPHY, JOSEPH RUBESTELLI, DETECTIVE J. STAR #D78, and UNIDENTIFIED EMPLOYEES of the CITY OF CHICAGO HEIGHTS, awarding compensatory damages, costs, and attorneys' fees, as well as punitive damages against all individual defendants, and any other relief this Court deems just and appropriate.

28

**JURY DEMAND**

Plaintiff, RODELL SANDERS, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:

s/ Elliot Slosar_____
Attorneys for Rodell Sanders

Arthur Loevy
Jon Loevy
Michael Kanovitz
Russell Ainsworth
Gayle Horn
Elliot Slosar
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900