**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RODELL SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13 C 0221 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO HEIGHTS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On January 8, 2016, Defendant City of Chicago Heights, Illinois ("Chicago Heights" or the "City") moved to exclude the expert testimony of Plaintiff Rodell Sanders' police practices expert Dr. William T. Gaut pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). After the parties briefed the present motion, the Court held a *Daubert* hearing on April 20, 2016, at which Dr. Gaut testified. For the following reasons, the Court, in its discretion, grants in part and denies in part Chicago Heights' motion.

## BACKGROUND

### I. Factual Background

On April 10, 2015, Plaintiff Rodell Sanders filed a Second Amended Complaint alleging deprivations of his constitutional rights, along with common law claims, against Defendants Chicago Heights and certain Chicago Heights police officers. In his Second Amended Complaint, Sanders alleges that he was wrongfully convicted of murder and attempted murder. (R. 90, Second Am. Compl. ¶¶ 1-4.) Sanders alleges that he spent approximately twenty years in

prison, during which his conviction was vacated on January 14, 2011. (*Id.* ¶¶ 1, 4, 40.) The Illinois Appellate Court affirmed the Circuit Court's ruling overturning Sanders' conviction and vacated his sentence on May 30, 2012. (*Id.* ¶ 42.) The State of Illinois re-tried Sanders, and on July 22, 2014, a jury acquitted him of all of the charges against him. (*Id.* ¶ 43.)

As to the underlying offenses, in 1995 a jury convicted Sanders of the murder of Phillip Atkins, attempted murder of Stacy Armstrong, and armed robbery. (*Id.* ¶ 38.) The facts underlying the offenses include that in the early hours of December 15, 1993, Armstrong and Atkins were sitting in a parked car and, after being abruptly awoken, a group of men accosted them and took them to an abandoned garage. (*Id.* ¶¶ 12, 13.) While robbing the victims, the perpetrators shot and killed Atkins and shot Armstrong leaving her for dead. (*Id.* ¶ 14.)

Sanders further alleges in his Second Amended Complaint that Defendant Officers Jeffrey Bohlen and Robert Pinnow knew him, bore a grudge against him, and, that despite the lack of evidence against him, Defendant Officers framed him as a perpetrator of the shooting. (*Id.* ¶¶ 18, 21-23.) To that end, Sanders asserts that Defendant Officers concocted a flawed photo line-up designed to improperly implicate him, after which Armstrong identified him as one of the perpetrators. (*Id.* ¶¶ 25, 26.)

Also, in January 1994, Defendant Officers arrested Sanders' fellow gang member Germaine Haslett on unrelated charges. (*Id.* ¶ 28.) According to Sanders, Haslett had been cooperating with the Chicago Heights Police Department regarding an individual named Bernard Ellis. (*Id.*) On the day of his arrest, Haslett confessed to his role in the Atkins murder. (*Id.* ¶ 29.) Sanders further alleges that to protect Haslett as their key witness against Ellis, Defendant Officers sought to minimize Haslett's complicity in the Atkins murder by allowing him to claim

that he was simply the "lookout" in exchange for pointing the finger at Sanders. (*Id*. ¶ 30.) Specifically, in exchange for implicating Sanders, Haslett pleaded guilty to armed robbery in the Atkins/Armstrong case instead of going to trial on murder and attempted murder charges. (*Id*. ¶ 31.) Also, Sanders asserts that law enforcement officials conferred other benefits to Haslett. (*Id*. ¶¶ 32-36.) Haslett later recanted his accusations against Sanders – although the parties dispute under what circumstances Haslett did so.

Sanders further maintains that the Chicago Heights Police Department has a history of police misconduct relevant to his claims. (*Id*. ¶ 44.) Sanders specifically highlights Defendant Officer Sam Mangialardi's 1993 arrest and subsequent 1994 conviction for racketeering, witness tampering, and extortion. (*Id*. ¶¶ 45-48.) According to Sanders, the corruption within the Chicago Heights Police Department was so widespread that the Chicago Heights Mayor enlisted a retired Supreme Court of Illinois Justice to investigate the police department. (*Id*. ¶ 49.) Sanders contends that a total of six police officers and fifteen public officials were convicted based on this systemic corruption. (*Id*. ¶ 48.)

The remaining claims in this lawsuit include the following counts: In Count I of his Second Amended Complaint, Sanders alleges that Defendants violated his due process right to a fair trial by deliberately withholding exculpatory evidence, employing unduly suggestive identification procedures, and fabricating evidence. In Count III, Sanders alleges that prior to arresting him, Defendant Officers reached an agreement to frame him for murder and attempted murder, thus depriving him of his constitutional rights. In Count V, Sanders alleges that Defendant Officers failed to intervene to prevent the violation of his constitutional rights. In Count X, Sanders alleges a common law malicious prosecution claim, and in Count XI, he

alleges a common law intentional infliction of emotional distress claim.[1]

## II.    Dr. Gaut's Qualifications

Dr. Gaut has a Ph.D. in criminal justice from Northcentral University, a Masters Degree in Public and Private Management from Birmingham Southern College, and a Bachelor of Science Degree in Criminal Justice from the University of Alabama-Birmingham.  In addition, Dr. Gaut has completed specialty training from the Federal Bureau of Investigation, the Drug Enforcement Administration, the U.S. Secret Service, the U.S. Marshal's Service, the Internal Revenue Service, the New York City Police Department, the Los Angeles Police Department, the Boston Police Department, and the Texas Department of Public Safety.

Moreover, Dr. Gaut is a former homicide detective, who spent 24 years working for the Birmingham Police Department.  Dr. Gaut's investigative experience includes 17 years as a Detective Sergeant assigned to the Crimes Against Persons Division.  His command-level experience includes that of:  (1) Captain of Detectives, where he supervised the daily activities of 120 investigators; and (2) Patrol Precinct Commander, where he supervised the daily activities of 130 police officers and mid-level supervisory officers.  While working for the Birmingham Police Department, Dr. Gaut had extensive training in crime scene evidence collection and analysis and field experience in forensic analysis.  Dr. Gaut is an active member of the American Academy of Forensic Sciences and the American College of Forensic Examiners Institute and

---

[1]  Because the Court granted Plaintiff's motion to voluntarily dismiss Defendant Maureen Teed, a Federal Bureau of Investigation Agent, on October 15, 2014, Plaintiff's claims brought pursuant to *Bivens v. Six Unknown Federal Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.E.2d 619 (1971), are no longer part of this lawsuit.  In addition, on November 7, 2014, the Court granted – with prejudice – Defendants' Rule 12(b)(6) motion to dismiss Plaintiff's stand-alone supervisory liability claim alleged in Count VII and Plaintiff's 42 U.S.C. § 1983 malicious prosecution claim as alleged in Count VIII.

currently holds Board Certification Diplomat/Fellow status by the American Board of Forensic Examiners.

After working for the Birmingham Police Department, Dr. Gaut served as the Jefferson County District Attorney's Director of Special Services as an Alabama State Police Officer. In his capacity as a State Police Officer with the Jefferson County District Attorney's Office, Dr. Gaut designed and performed the initial public research project and wrote the organization's Daily Operations Procedures. Also, Dr. Gaut served as an adjunct professor in the areas of criminal justice, criminal law, and homicide investigation at Jefferson State Community College in Birmingham, Alabama, and has also served as an instructor at the Birmingham Police Academy. While acting as a police academy instructor, Dr. Gaut sat on the Governor of Alabama's original committee to formulate minimum standards of training for all Alabama police officers.

In the last five years, Dr. Gaut has served and testified as an expert witness and consultant in over fifty cases – both state and federal – in the discipline of police practices and procedures.

## III. Dr. Gaut's Expert Opinions

Dr. Gaut offers eight separate opinions in his August 2015 expert report: (1) the actions of police administrators constituted a failure to train police detectives employed by the City of Chicago Heights, through its Chicago Heights Police Department ("CHPD"); (2) there was a failure to supervise police detectives, leading detectives to believe they could act with impunity; (3) the CHPD's policy on photo arrays and lineup procedures was defective and offered no legitimate guidance; (4) the CHPD's policies and practices for confidential informants were

nonexistent, and in essence, fatally defective; (5) the CHPD's failure to enact policies on key topics offered no guidance and allowed too much discretion to individual detectives; (6) the actions of the CHPD's administrators and supervisory command personnel amounted to corruption in office; (7) the investigative practices of the defendant detectives violated generally accepted standards of police investigation; and (8) the violation of the collective standards and police practices by the defendants rises to the level of deliberate indifference and was the direct cause of harm to Rodell Sanders.  (R. 161-5, Ex. E, Gaut Expert Rep., at 9-10.)

## DAUBERT STANDARD

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993)."  *Brown v. Burlington No. Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014).  "The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue."  *Hartman v. EBSCO Indus., Inc.,* 758 F.3d 810, 817 (7th Cir. 2014); *see also Higgins v. Koch Dev. Corp.,* 794 F.3d 697, 704 (7th Cir. 2015) ("Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable.").  Although the Seventh Circuit reviews "the district court's application of *Daubert* [] de novo," if "the court adhered to the *Daubert* framework, then its decision on admissibility is reviewed for abuse of discretion."  *Estate of Stuller v. United States,* 811 F.3d 890, 895 (7th Cir. 2016).

A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012); *see also Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th Cir. 2011) ("The admissibility determination is not intended to supplant the adversarial process, and so even 'shaky' testimony may be admissible."). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley,* 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596). A district court's inquiry under *Daubert* is a flexible one and district courts have wide latitude in performing this gate-keeping function. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Hartman,* 758 F.3d at 818. "'[T]he key to the gate is not the ultimate correctness of the expert's conclusions,'" rather, "'it is the soundness and care with which the expert arrived at her opinion[.]'" *C.W. ex rel. Wood v. Textron, Inc.,* 807 F.3d 827, 834 (7th Cir. 2015) (citation omitted). Last, the "proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009).

## ANALYSIS

In its *Daubert* motion, Chicago Heights does not challenge Dr. Gaut's qualifications and experience. Rather, Chicago Heights asserts that some of Dr. Gaut's opinions do not fulfill the *Daubert* standard for reliability, while other opinions are not helpful or relevant. *See Daubert,* 509 U.S. at 597 (district court must ensure that expert evidence "both rests on a reliable

foundation and is relevant to the task at hand.").  Chicago Heights specifically argues that:  (1) some of Dr. Gaut's opinions are not supported by the record; (2) Dr. Gaut made improper credibility determinations and legal conclusions; and (3) Dr. Gaut misapplied the legal standard under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

## I.    Reliability

The Court first turns to the City's argument that some of Dr. Gaut's opinions are not supported by the record, which speaks to the reliability requirement under *Daubert* and Rule 703.  *See Stuhlmacher v. Home Depot U.S.A., Inc.,* 774 F.3d 405, 409 (7th Cir. 2014) ("Expert testimony is admissible at trial if the testimony is relevant to a fact in issue, is based on sufficient facts or data, and is the product of reliable scientific or other expert methods that are properly applied."); *see also Brown,* 765 F.3d at 772 ("Rule 703 requires the expert to rely on 'facts or data,' as opposed to subjective impressions").  Although an expert's opinion must be founded on sufficient facts or data, *see Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887, 894 (7th Cir. 2011), "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment."  *Manpower, Inc. v. Ins. Co. of Penn.,* 732 F.3d 796, 806 (7th Cir. 2013) (citation omitted).  A "district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Higgins,* 794 F.3d at 704 (citation omitted).

In its *Daubert* motion, Chicago Heights challenges three factual contentions that Dr. Gaut relied upon in forming his opinions, namely:  (1) Germaine Haslett was the "key" witness for the State in prosecuting Bernard Ellis; (2) Haslett received benefits in exchange for cooperating

against Sanders; and (3) had Defendant Officers conducted a proper investigation, they would have discovered that Sanders was at another location at the time of the Atkins murder. At the *Daubert* hearing, Sanders withdrew Dr. Gaut's opinion regarding Haslett receiving benefits, including monetary benefits, in exchange for cooperating against Sanders, and Dr. Gaut's opinion about Defendants' failure to investigate alibi witnesses. The Court therefore turns to the City's challenge regarding the factual foundation that Haslett was a key witness for the State against Ellis.

In Dr. Gaut's expert report, he relied on Haslett's deposition testimony that Chicago Heights' detectives knew that Haslett was the offender who gave the order to shoot Atkins and Armstrong, but that the detectives did not want Armstrong to identify him because he was a "key witness" in a separate case against Bernard Ellis. (Gaut Expert Rep., at 41.) At his deposition in this matter, Haslett stated that he was cooperating in three criminal investigations involving Ellis and that he testified against Ellis regarding the murder of Gerard Hardy, the shooting of Dwayne Allen, and a third shooting at King Park in Chicago Heights. (R. 161-6, Ex. F, 2/9/15 Dep., at 5-6, 118-36, 141, 146-48, R. 161-7, Ex. G, 2/27/15 Dep., at 247-48.). Haslett also testified at his deposition that the police wanted him to help them on the Ellis prosecutions and that he gave the police information about Ellis. (Ex. G, 2/27/15 Dep., at 333-34.) Further, Haslett explains at his deposition how he told Sanders about his testimony against Ellis. (Ex. F, 2/9/15 Dep., at 138-41.) There is additional evidence in the record supporting the factual premise that Haslett was the key witness against Ellis, namely, Haslett's letter to Wendy Jones – his girlfriend's cousin – in which he described that he was helping the police out in a case against Silver Dollar (Ellis). (Ex. D, 7/29/94 letter.)

At the *Daubert* hearing, Dr. Gaut testified that he relied upon the above-referenced evidence, as well as the depositions of police officers who testified that Haslett was an eyewitness to two of the incidents discussed above. He further testified at the hearing that he reviewed police reports that listed Haslett as a witness. Dr. Gaut then explained that he defined "key witness" as an eyewitness or person who has firsthand knowledge of a crime and, that from his review of the materials, Haslett was either an eyewitness or was at the scene during each of the shootings.

Based on this record, there are sufficient factual underpinnings – as opposed to mere subjective impressions – to support Dr. Gaut's statement that Haslett was the key witness against Ellis. *See Brown*, 765 F.3d at 771-72. The Court, in its discretion, therefore denies this aspect of Chicago Heights' motion. At trial, Chicago Heights can challenge the accuracy of the underlying evidence by using vigorous cross-examination and presenting contrary evidence. *See Lapsley*, 689 F.3d at 805; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013) ("The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible.").

## II. Assist Trier of Fact – Relevancy

The City's remaining arguments in its *Daubert* motion regarding credibility determinations, legal conclusions, and the application of the *Brady* standard go to the relevancy requirement under *Daubert* and Rule 702. *See Jimenez v. City of Chicago,* 732 F.3d 710, 721 (7th Cir. 2013); Fed.R.Evid. 702(a). Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue,'" which "goes primarily to relevance." *Daubert*, 509 U.S. at 591. "An expert's testimony qualifies as relevant

under Rule 702 so long as it assists the jury in determining any fact at issue in the case."

*Stuhlmacher,* 774 F.3d at 409.

### A. Credibility Assessments

In its *Daubert* motion, Chicago Heights maintains that Dr. Gaut made improper credibility determinations in forming his expert opinions – specifically pointing to Dr. Gaut's fourth opinion regarding confidential informants and his seventh opinion concerning the CHPD's investigative practices. When forming his opinion on the CHPD's policies and practices for confidential informants, Dr. Gaut relied, in part, on the fact that Haslett recanted his statement that Sanders had participated in the Atkins murder. (Gaut Expert Rep., at 21.) Similarly, in concluding that the CHPD's investigative practices violated generally accepted standards of police investigation, Dr. Gaut relied on the fact that Haslett claims he falsely named Sanders as the perpetrator of the Atkins murder. (*Id.* at 44.)

More specifically, the City argues that Haslett's "recantations" were averred in his affidavits that he signed while in prison or in letters Haslett wrote to his sister while he was incarcerated, and thus he made these recantations under duress. In particular, without citing to the record, Chicago Heights argues that Haslett testified that he made his recantations under duress because "at one point he had a shank held to his neck to compel him to sign" the recantations. Also without citation to evidence in the record, Chicago Heights claims that "Sanders sent a private investigator to interview Haslett while in prison and gave the investigator a 'kite' or code word to give Haslett at the beginning of the interview so that Haslett would know he was supposed to answer a certain way or face violent consequences." Chicago Heights further argues that prior to his recantations, Haslett consistently and repeatedly testified that

Sanders was involved in the Atkins murder. Based on Haslett giving opposite versions of Sanders' involvement in the Atkins murder, the City contends that Dr. Gaut made impermissible credibility determinations regarding this evidence when he relied upon Haslett's recantations.

It is well-settled that determining the weight and credibility of witness testimony is the exclusive province of the jury and that experts are not permitted to offer opinions as to the believability or truthfulness of witness testimony. *See United States v. Hall,* 165 F.3d 1095, 1107 (7th Cir. 1999) ("[T]he credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury – determining the credibility of witnesses."). Nonetheless, experts can base their opinions on disputed facts because the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.,* 782 F.3d 353, 360 (7th Cir. 2015) (citation omitted). Indeed, the Advisory Committee's Notes to Rule 702 envision factual disputes in the context of expert opinions as follows:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the [Rule] on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed.R.Evid. 702, advisory committee's note (2000 amends.). "The Advisory Committee stressed that 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system' or to allow the district court to preempt the jury by evaluating the correctness of the facts on which the expert relied." *Richman v. Sheahan,* 415 F. Supp. 2d 929, 943 (N.D. Ill. 2006) (citation omitted). Moreover, although an expert cannot rely on facts that are clearly contradicted by undisputed evidence, an expert may rely on his client's version of the facts when

forming his opinions.  *See Cage v. City of Chicago,* 979 F. Supp. 2d 787, 810 (N.D. Ill. 2013).

In his expert report, Dr. Gaut unequivocally stated that he was not offering an opinion as to Haslett's credibility regarding Haslett's trial testimony and recantations.  (Gaut Expert Rep., at 44.)  At his deposition, Dr. Gaut testified that he did not make any credibility determinations about Haslett's trial testimony or the recantation evidence stating that making any such determination "puts me in a position of invading the providence [of] the jury" and "credibility and veracity is not a subject matter that I'm willing to address, so that's up to the jury and the judge."  (R. 161-13, Ex. M, Gaut Dep., at 248-49.)  When asked about the factual underpinnings of his opinion, Dr. Gaut testified that he reviewed the documents provided by counsel and that counsel did not ask him to make any assumptions in completing his report.  (*Id*. at 249.)

In particular, at his deposition, Dr. Gaut testified that he reviewed 23 to 24 binders worth of materials in rendering his expert opinions.  (Gaut Dep., at 78-79, 90, 173, 214.)  These binders included deposition transcripts, trial transcripts, appellate decisions, photographs, police reports, and affidavits.  (*Id.*)  In his expert report, Dr. Gaut stated that he reviewed over 8,000 pages of documents that included numerous deposition and trial transcripts; the pleadings in this matter; Haslett's plea and sentencing transcripts; Chicago Heights' police reports, rules, regulations, and procedures; Chicago Heights' ordinances; and affidavits, among other documents.  (Gaut Expert Rep., at 407.)[2]

---

[2]  The City argues that Dr. Gaut cannot rely on hearsay evidence in forming his opinions. Rule 703, however, allows experts to rely on hearsay evidence provided that such reliance is accepted by experts in their filed.  *See Tilstra v. BouMatic LLC,* 791 F.3d 749, 753 (7th Cir. 2015); *see also N.L.A. v. Holder,* 744 F.3d 425, 440 (7th Cir. 2014) ("Federal Rule of Evidence 703 allows experts to rely on hearsay if it is the kind of facts or data upon which 'experts in the field would reasonably rely'").  At the *Daubert* hearing, Dr. Gaut testified that police reports, trial and deposition transcripts, and affidavits are the type of documents police practices experts

At the *Daubert* hearing, Dr. Gaut explained that when he states in his expert report that Haslett recanted his statements about Sanders' involvement in the Atkins murder, he relied upon multiple sources verifying that Haslett recanted, and that his statement was not "just a subjective opinion." He testified that he relied upon the recantation that Haslett made to his sister Sherry Newman, as evidenced by her deposition testimony, Haslett's letter to Wendy Jones, and Haslett's recantation to Sanders himself. Further, Dr. Gaut testified that he is not stating that Haslett's recantations were either truthful or not truthful because that would be beyond the scope of what he is allowed to do in his opinion.

From the record, it is evident that Dr. Gaut based his opinions on the facts that he gleaned by reviewing the record, which is permissible under Rule 702. In sum, although Dr. Gaut cannot tell the jury whether to believe what a witness says, *see Jimenez,* 732 F.3d at 723, he may base his opinions on disputed evidence because it is the role of the jury to weigh the evidence. *See Stollings,* 725 F.3d at 766; *Cage,* 979 F.Supp.2d at 810-11. The Court, in its discretion, denies this aspect of Chicago Heights' *Daubert* motion.

## B. Legal Conclusions

Next, the City contends that Dr. Gaut has offered impermissible legal conclusions in his expert report. As a general rule, an expert cannot offer legal opinions or conclusions. *See Jimenez,* 732 F.3d at 721; *see also Client Funding Solutions Corp. v. Crim,* 943 F. Supp. 2d 849, 863 (N.D. Ill. 2013) ("Opinions that amount to legal conclusions do not assist the trier of fact."). As the Seventh Circuit teaches, "[e]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of*

---

rely upon.

*Momence,* 323 F.3d 557, 564 (7th Cir. 2003). Put differently, although Rule 704(a) "states that '[a]n opinion is not objectionable just because it embraces an ultimate issue,'" Rules 702 and 704, "prohibit experts from offering opinions about legal issues that will determine the outcome of a case." *Roundy's Inc. v. N.L.R.B.,* 674 F.3d 638, 648 (7th Cir. 2012).

Nevertheless, "[t]here is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts." *United States v. Blount,* 502 F.3d 674, 680 (7th Cir. 2007). In the context of constitutional tort claims, "[w]hen an expert offers an opinion relevant to applying a legal standard," the "expert's role is 'limited to describing sound professional standards and identifying departures from them.'" *Jimenez,* 732 F.3d at 721 (citation omitted). Specifically, "[e]xpert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights." *Id.* at 721-22.

### 1. Deliberate Indifference

In its motion, Chicago Heights argues that Dr. Gaut's use of the term "deliberate indifference" is an impermissible legal conclusion. *See Connick v. Thompson,* 563 U.S. 51, 61, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) ("'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.") (citation omitted); *Matthews v. City of E. St. Louis,* 675 F.3d 703, 709 (7th Cir. 2012) ("an inadequacy in police training can serve as a basis for liability under Section 1983, but only where the failure to train amounts to deliberate indifference to the citizens the officers encounter."). In his expert report, Dr. Gaut opines that the "violation of the

collective standards and police practices by the defendants rises to the level of deliberate indifference and was the direct cause of harm to Rodell Sanders." (Gaut Expert Rep., at 10, 48-49.) Dr. Gaut further uses the term "deliberate indifference" in his expert report when referring to the Chicago Heights Police Department's failure to properly train its police officers and in the context of police officers' knowingly violating police policy or practices. (*Id.* at 11, 14, 21.) He also explains in his expert report that he relied upon an article published by the International Association of Chiefs of Police that stated: "Failure-to-train liability ... can result from a policy if it rises to the level of deliberate indifference. When the need for more or different training is so obvious, and the inadequacy so likely to result in [a] violation of constitutional rights, policymakers can reasonably be said to have been deliberately indifferent to the need." (*Id.* at 10.) Dr. Gaut defined deliberate indifference in his expert report as follows:

> *Deliberate indifference* is the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence, but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.

(*Id.* at 49.) (emphasis in original). At the *Daubert* hearing, Dr. Gaut testified that he derived this definition of deliberate indifference from Black's Law Dictionary because it is one of the texts that the police academy uses.

At his deposition, when asked whether deliberate indifference is a legal standard, Dr. Gaut testified that although it is a legal standard used by attorneys and judges, "I don't think that they have any sort of exclusive right to use it. It's a statement – it's a term that I use, police departments use, people on the street use." (Gaut Dep., at 168.) When asked whether deliberate indifference has a significant meaning in law enforcement parlance versus the legal community, Dr. Gaut stated that "just because it has the same term and the same definition doesn't mean that

I'm not allowed to use it, or any other police officer for that matter." (*Id.* at 168-69.) Dr. Gaut

further testified that his definition of deliberate indifference is "[b]ased on my reading of

textbooks, police textbooks. It's based on my work as an expert witness, based on what I've

heard attorneys use, that phrase. And, in some aspects, yes, I have read it in case law as well."

(*Id.* at 169.) He also stated that "deliberate indifference" is a term used in the law enforcement

community and that he has used the term continuously for the past 20 years. (*Id.* at 205.)

At the *Daubert* hearing, Dr. Gaut testified that the evidence he reviewed for this matter

established that there was deliberate indifference in the context the Chicago Heights Police

Department's failure to train and discipline and that Chicago Heights police officers and

detectives turned a blind eye to police misconduct. He stated that deliberate indifference

happens when there is knowledge of wrongdoing and that potential consequences could violate

of a citizen's civil rights, yet a police officer does not do anything or simply allows it to happen.

In addition, he clarified that at the police academy when he teaches ethical conduct and

investigative procedures, he informs police officers about certain aspects of the law, including

the concept of deliberate indifference, namely, that police officers cannot intentionally ignore a

situation, especially if there are potential adverse consequences to an officer's indifference. Dr.

Gaut also testified that he provides detailed instructions about deliberate indifference in police

academy courses for supervisors.

Based on Dr. Gaut's testimony, his expert opinions regarding "deliberate indifference"

do not necessarily relate to "purely legal matters" and are not "made up solely of legal

conclusions." *Good Shepherd,* 323 F.3d at 564. That being said, Dr. Gaut's opinions in which

he concludes that Defendant Officers or the City violated Sanders' constitutional rights because

their policies or conduct amounted to "deliberate indifference" are legal arguments that counsel should present at summary judgment or trial – and not via expert opinion testimony – because these opinions are legal conclusions that are outcome determinative. *See Roundy's Inc.,* 674 F.3d at 648; *Good Shepard,* 323 F.3d at 564. To clarify, although Dr. Gaut attempts to distinguish his definition of deliberate indifference from its constitutional meaning, any such testimony regarding deliberate indifference would not be helpful to the jury. *See Hopkins v. City of Huntsville, Ala.,* No. CV-13-S-429- NE, 2014 WL 5488403, at *3 (N.D. Ala. Oct. 29, 2014) ("Here, Dr. Gaut's opinions as to the constitutionality of the individual defendants' actions and the City's policies will not assist the trier of fact, because it is the role of the judge, and not an expert witness, to instruct the jury on the applicable principles of law."); *Weigle v. Pifer,* No. 2:14 CV 15087, 2015 WL 1980737, at *5 (S.D.W.Va. Apr. 30, 2015) ("Gaut's training, education and experience seem to have provided him with the requisite specialized knowledge to be qualified as an expert on police procedures and training techniques, including those related to the use of force. To the extent he offers opinions that flow from that specialized knowledge, and his testimony is within the parameters set forth in this opinion – that is, his testimony does not consist solely of bald legal conclusions or do nothing more than apply legal standards to the facts of the case – his testimony may very well be considered helpful to the jury."). Moreover, any such testimony would add to juror confusion because in order to find the City liable, the jury must determine if the City's conduct amounts to deliberate indifference, *see Connick,* 563 U.S. at 61, and the Court will instruct the jury as such. *See* Seventh Circuit Pattern Jury Instruction 7.21. Because Dr. Gaut's definition of deliberate indifference is not necessarily the same as the Court's instruction on the legal definition of deliberate indifference, his testimony on this issue

will only confuse the jury.

Accordingly, the Court, in its discretion, grants the City's motion to exclude Dr. Gaut's legal conclusions that Defendant Officers' or the City's conduct amounted to "deliberate indifference." Dr. Gaut, however, may testify to the relevant professional standards and identify departures from these standards, including that the City's customs or practices led to violations of generally accepted police standards and procedures. *See Jimenez,* 732 F.3d at 721; *see also Hopkins,* 2014 WL 5488403, at *5 ("The expert opinion of Dr. Gaut on the issue of whether defendants' actions and policies were consistent with reasonable, typical police practices and procedures is admissible, however, and will be considered by this court.") (citing *Jimenez*, 732 F.3d at 721-22). In sum, Dr. Gaut's opinion testimony is "limited to describing sound professional standards and identifying departures from them." *Jimenez,* 732 F.3d at 721 (citation omitted).

### 2.      Basis of Sanders' Conviction

Chicago Heights further argues that Dr. Gaut made the impermissible legal conclusion that "[o]n the basis of Mr. Haslett's confession and Ms. Armstrong's identification, Rodell Sanders was convicted of the crimes of murder and attempted murder." (Gaut Expert Rep., at 9.) Dr. Gaut made this statement in the factual background section of his report prefacing the section with the statement that "[m]y understanding of the facts in this case is summarized as follows." (*Id.* at 7.) At his deposition, Dr. Gaut testified that he gleaned these facts from Sanders' criminal trial transcript. (Gaut Dep., at 180.) When asked about other trial testimony implicating Sanders, Dr. Gaut stated that he did not specifically recall Defendant Officer Bohlen's exact testimony at Sanders' trial nor evidence concerning the confidential informant Edward

Villagomez.[3]  The City thus argues that Dr. Gaut's opinion testimony is faulty because he did not consider this additional evidence.

In response, Sanders asserts that Dr. Gaut is not offering an opinion about the basis of Sanders' conviction and that this comment is merely Dr. Gaut's factual understanding of the case.  Indeed, the City's argument that Dr. Gaut's factual understanding is faulty does pertain to a legal conclusion, but challenges the factual basis of his opinions.  As discussed above, Chicago Heights can challenge the accuracy of Dr. Gaut's factual bases at trial by cross-examining him and presenting contrary evidence.  *See Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Manpower,* 732 F.3d at 806 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment.").  Therefore, the Court, in its discretion, denies the City's motion to exclude Dr. Gaut's factual statement that Sanders' conviction was based on Haslett's confession and Armstrong's identification.

### C.    Application of Brady

The City further contends that Dr. Gaut misapplied the *Brady* standard to the facts of this case.  *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  In *Brady*, "the Supreme Court held that the accused in a criminal case has a due process right to have the prosecution disclose material exculpatory evidence, including evidence that impeaches the

---

[3]  At the *Daubert* hearing, Sanders' counsel advised the Court that Dr. Gaut would not testify at trial about whether Defendant Officer Bohlen's testimony concerning Villagomez is admissible.

credibility of prosecution witnesses." *Jimenez*, 732 F.3d at 716. The duty to disclose under *Brady* equally applies to police officers. *See Youngblood v. W. Virginia,* 547 U.S. 867, 869-70, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) (per curiam); *Newsome v. McCabe,* 256 F.3d 747, 752-53 (7th Cir. 2001).

### 1.     Investigative Failures

Chicago Heights first points to the following opinions about the investigation into the Atkins murder as impermissible and irrelevant due to Dr. Gaut's misunderstanding of *Brady*:  (1) the failure to keep investigative notes; (2) the failure to retrieve the pager of the murder victim; (3) the failure to follow certain procedures with respect to confidential informant Villagomez; and (4) the failure to "collect physical evidence."[4]  The City specifically argues that these opinions are unavailing because Dr. Gaut did not identify what exculpatory or impeachment evidence would have resulted if the "correct" practices had been followed relying on the proposition that sloppy investigative practices do not necessarily violate due process. *See Alexander v. City of S. Bend,* 433 F.3d 550, 555 (7th Cir. 2006).

In response, Sanders contends that he is not alleging or arguing that any of these investigative failures constitute a *Brady* violation – nor has Dr. Gaut.  Rather, Sanders asserts that each alleged failure is relevant to how the Chicago Heights Police Department investigated the Atkins murder and whether this investigation was conducted pursuant to standard police procedures. *See Jimenez,* 732 F.3d at 721-22.  Indeed, as the Seventh Circuit teaches, "in order

_____

[4] Although Dr. Gaut did not opine about the failure to "collect physical evidence" in his expert report, it appears that the City is basing its argument on his deposition testimony in which Dr. Gaut stated that even though the City's police officers "had lots of potential for recovering physical evidence [regarding the Atkins murder], nobody bothered to look for it."  (Gaut Dep., at 60.)

for an expert's testimony to qualify as 'relevant' under Rule 702 it must assist the jury in determining *any* fact at issue in the case," and "[a]lthough under Rule 704(a) an expert may testify to the ultimate issue in a case, the expert's testimony need not relate to the ultimate issue in order to be relevant under Rule 702." *Smith v. Ford Motor Co.*, 215 F.3d 713, 721 (7th Cir. 2000) (emphasis in original). Dr. Gaut's opinions – highlighted directly above – go to the issue of whether Defendant Officers' investigative conduct departed from reasonable police practices, which is relevant to Sanders' theory of the case. *See Jimenez,* 732 F.3d at 721-22.

The City also asserts that Dr. Gaut's opinion regarding Defendant Officers' failure to investigate other alleged perpetrators identified by Haslett is irrelevant and improperly applies the *Brady* standard. Specifically, Chicago Heights argues that Dr. Gaut's opinion fails to acknowledge that the police officers were not required to investigate Sanders' defense nor were they required to investigate other perpetrators once the officers had established probable cause to arrest Sanders. *See Stokes v. Bd. of Educ. of the City of Chicago,* 599 F.3d 617, 624 (7th Cir. 2010) ("While an officer may not close his or her eyes to clearly exculpatory facts, the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation."). Sanders' theory of liability, however, does not necessarily involve the initial probable cause for his arrest, but rather that after his arrest and prior to his criminal trial, Defendant Officers failed to investigate other alleged perpetrators who witnesses identified during in the officers' investigation.

In any event, Dr. Gaut does not opine that Defendant Officers' failure to investigate the alleged perpetrators constitutes a *Brady* violation. Instead, Dr. Gaut opines that these investigative shortcomings deviated from proper police practices. (Gaut Expert Rep., at 41-44.)

As such, this testimony is relevant because it would assist the trier of fact regarding proper police procedures. *See Jimenez*, 732 F.3d at 721 ("In constitutional tort cases, expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful."); *Stollings*, 725 F.3d at 765 (the jury is the "arbiter of the weight and credibility of expert testimony"). The Court, in its discretion, denies this aspect of the City's *Daubert* motion.

### 2. Suggestive Identification Procedures

Chicago Heights also argues that Dr. Gaut's opinions concerning the "unduly suggestive" identification procedures, namely, the photo array and line-up, are inadmissible because Dr. Gaut did not tie these suggestive identification procedures to Sanders' criminal trial in order to establish that the flaws in the identification techniques amounted to a constitutionally unfair trial. *See Lee v. Foster,* 750 F.3d 687, 691 (7th Cir. 2014) ("witness's identification violates a defendant's right to due process when the identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."); *Alexander,* 433 F.3d at 555 (due process right to fair trial is "violated if unduly suggestive identification techniques are allowed to taint trial.") As the City has repeatedly argued in its *Daubert* motion, however, Dr. Gaut is prohibited from making any such legal conclusions. *See Good Shepherd,* 323 F.3d at 564. Accordingly, this argument is without merit. Also without merit is the City's contention that Sanders is estopped from making this argument because his defense counsel did not move to suppress the identification evidence prior to his criminal trial. *See Evans v. Katalinic,* 445 F.3d 953, 955-56 (7th Cir. 2006).

In addition, Dr. Gaut's opinion that Chicago Heights police officers did not conform to standard police protocol regarding the identification procedures at issue is relevant to Defendant

Officers' argument that – at best – Sanders can only establish that the identification procedures were sloppy and amounted to mere negligence. In short, the jury could draw a reasonable inference of intentional conduct from Dr. Gaut's opinion regarding the officers' failure to follow appropriate police procedures. *See Jimenez,* 732 F.3d at 721-22 ("Expert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights."). Accordingly, the Court, in its discretion, denies Chicago Heights' motion to preclude this evidence.

### 3.    Sanders' Knowledge of Evidence

Last, Chicago Heights argues that Dr. Gaut's opinion concerning Haslett's recantations is not relevant because recantation evidence was available to Sanders at the time of his first criminal trial, and thus the failure to disclose this evidence does not constitute a *Brady* violation. *See United States v. Walker,* 746 F.3d 300, 306 (7th Cir. 2014) (under *Brady,* "even if the government failed to disclose material evidence, the evidence is not 'suppressed' if the defendant knew of the evidence and could have obtained it through the exercise of reasonable diligence."). As Sanders maintains, whether he knew about Haslett's recantation prior to his criminal trial is not at issue in relation to Dr. Gaut's expert opinion. Indeed, at this stage of the proceedings, whether Sanders' *Brady* claim is with or without merit is not at issue, and therefore, Chicago Heights' argument is best left for summary judgment.

Likewise, the City argues that Dr. Gaut's opinions regarding corruption within the Chicago Heights Police Department are improper because Sanders knew he was extorted, and

thus cannot establish a *Brady* violation based on the alleged extortion.  *See Walker,* 746 F.3d at 306.  To clarify, in his expert report, Dr. Gaut noted that Sanders alleged that he made payments to Defendant Officer Pinnow and that in exchange for these payments, Defendant Officer Pinnow allowed Sanders to sell drugs in Chicago Heights.  Dr. Gaut unequivocally states in his report that he does not intend to offer an opinion as to the veracity of Sanders' allegation or to Defendant Pinnow's denial, but that he noted these facts in his report due to "coincidental similarities" with other examples of corruption in Chicago Heights involving Defendant Mangialardi.  (Gaut Expert Rep., at 28.)  More importantly, Sanders asserts that he is not basing his *Brady* violation on Defendant Officer Pinnow's alleged extortion, and that Dr. Gaut's opinion about the corruption in the Chicago Heights Police Department is relevant to his claims because it was part of the practice that led to his wrongful conviction.  The Court agrees and in its discretion denies the City's motion in this respect.

## CONCLUSION

For these reasons, the Court, in its discretion, grants in part and denies in part the City's *Daubert* motion.

**Dated:** May 2, 2016

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**

25