# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RODELL SANDERS,          )
                                       )
            Plaintiff,        )
                                       )     Case No. 13 C 0221
            v.                 )
                                       )
CITY OF CHICAGO HEIGHTS, et al.,   )
                                       )
           Defendants.    )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On April 10, 2015, Plaintiff Rodell Sanders filed a Second Amended Complaint alleging deprivations of his constitutional rights, along with state law claims, against Defendant City of Chicago Heights ("Chicago Heights" or "the City") and present and former Chicago Heights police officers Defendants Sam Mangialardi, Jeffrey Bohlen, Robert Pinnow, Anthony Murphy, Joseph Rubestelli, Jeffrey Goss, and Charles Nardoni. *See* 28 U.S.C. §§ 1331, 1367(a); 42 U.S.C. § 1983. Before the Court are Defendant Chicago Heights', Defendant Mangialardi's, and the other Defendant Officers' motions for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(a).

For the following reasons, the Court denies Defendant Chicago Heights' summary judgment motion, grants Defendant Mangialardi's summary judgment motion, and grants in part and denies in part Defendant Officers' summary judgment motion. The Court dismisses Defendants Mangialardi, Nardoni, Murphy, Rubestelli, and Goss as named Defendants from this lawsuit, and consequently grants Defendant Officers' motion regarding punitive damages against Chief Nardoni's widow Geraldine Nardoni, who the Court substituted as a named Defendant

after Defendant Chief Nardoni's passing.

The remaining Defendants in this lawsuit are Defendant Pinnow, Defendant Bohlen, and the City of Chicago Heights. The claims that survive summary judgment include all of Sanders' Fourteenth Amendment due process claims and attendant *Monell* claim against Chicago Heights, his conspiracy claim brought pursuant to 42 U.S.C. § 1983, and his common law claims of malicious prosecution and intentional infliction of emotional distress.

## BACKGROUND

### I. Procedural Background

After being incarcerated for approximately 20 years, on July 22, 2014, a Circuit Court of Cook County jury acquitted Plaintiff Rodell Sanders on all criminal counts involving the 1993 murder of Philip Atkins and the shooting of Stacy Armstrong. (R. 160, Pl.'s Rule 56.1 Stmt. Add'l Facts ¶¶ 1, 2; R. 143, Defs.' Joint Rule 56.1 Stmt. Facts ¶ 80.) Originally, a Circuit Court of Cook County jury convicted Sanders of murder and attempted murder in January 1995. (Defs.' Stmt. Facts ¶ 80.) Sanders then filed a successful post-conviction petition brought under the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, *et seq.,* in which the Circuit Court judge granted Sanders a new trial because of his trial counsel's constitutionally ineffective assistance of counsel. *See People v. Sanders,* No. 1-11-0373, 2012 WL 6955490, at *1 (1st Dist. May 30, 2012) (unpublished). The Illinois Appellate Court, First District, affirmed the Circuit Court, and the State retried Sanders in July 2014, at which time the jury acquitted him. (Pl.'s Stmt. Facts ¶ 1, Defs.' Stmt. Facts ¶ 82.) The present civil rights lawsuit followed.

## II.    The Parties

At the time of the December 1993 murder and resultant criminal investigation, Sanders was a high ranking member of the Gangster Disciples street gang in Chicago's south suburbs, which includes Chicago Heights.  (Pl.'s Stmt. Facts ¶ 101; Defs.' Stmt. Facts ¶¶ 29, 32.)  During the Atkins murder investigation, the Chicago Heights Police Department employed Defendants Jeffrey Bohlen, Robert Pinnow, and Jeffrey Goss as police detectives.  (*Id*. ¶ 82; Def.'s Stmt. Facts ¶ 4.)  Defendant Anthony Murphy was a Lieutenant and the Chief of Detectives and Defendant Joseph Rubestelli was a Sergeant in the Detectives Division.  (Defs.' Stmt. Facts ¶¶ 8, 9; Pl.'s Stmt. Facts ¶¶ 80, 81.)  Charles Nardoni, now deceased, was the Chief of Police during the Atkins murder investigation.  (Defs.' Stmt. Facts ¶¶ 6, 7.)  Defendant Sam Mangialardi, who was the Deputy Chief of Police under Chief Nardoni, had been suspended from the Chicago Heights Police Department on August 5, 1993 because he had been indicted on federal criminal charges.  (*Id.* ¶¶ 11, 12; Pl.'s Stmt. Facts ¶ 83.)  During the investigation of the Atkins shooting, Defendant Mangialardi did not supervise any police department employees nor did he actively investigate the shooting by interviewing witnesses or preparing reports.  (Defs.' Stmt. Facts ¶¶ 22, 26.)

The Court takes judicial notice that on August 3, 1993 a federal grand jury returned an indictment charging Defendant Mangialardi with racketeering, aiding and abetting a drug conspiracy, extortion, money laundering, theft of government funds, civil rights conspiracy, filing false tax returns, and witness tampering in case number 93 CR 0560-1.  *See Spaine v. Cmty. Contacts, Inc.,* 756 F.3d 542, 545 (7th Cir. 2014) (courts "may take judicial notice of publicly available records of court proceedings.").  On May 25, 1994, a jury found Defendant

Mangialardi guilty on all counts of the superseding indictment, and on July 5, 1995, the district

court judge sentenced Defendant Mangialardi to a total of 125 months in prison. (*See* 93 CR

0560-1, Defs.' Stmt. Facts ¶ 12.) Other Chicago Heights police officers and officials were

similarly indicted and convicted in relation to the FBI investigation that involved Defendant

Mangialardi. (Pl.'s Stmt. Facts ¶¶ 86-87, 98-99.)

III.     **December 1993 Shooting and Initial Investigation**

On December 14, 1993, Atkins was working at the Old Country Buffet restaurant in

Matteson, Illinois, where Armstrong picked him up after he had finished work. (Pl.'s Stmt. Facts

¶ 5; R. 157-9, Armstrong Dep., at 53, 79.) From there, Atkins and Armstrong, who were dating,

drove to a friend's house in Harvey, Illinois and then stopped at a payphone in Harvey. (Pl.'s

Stmt. Facts ¶¶ 5, 34.) Around 2:00 a.m. on December 15, 1993, Atkins and Armstrong were in

Armstrong's vehicle, which was parked in an alley near 1437 Portland Avenue in Chicago

Heights. (*Id*. ¶ 6.) At that time, several males approached the vehicle and ordered Atkins and

Armstrong out of the car at gunpoint. (*Id*.) The men then escorted Armstrong and Atkins to a

dark, secluded garage. (*Id*. ¶¶ 6, 7.) Inside the garage, the men questioned Atkins about his

gang affiliation and he revealed that he was a member of the Mickey Cobras, which is a rival

gang of the Gangster Disciples. (*Id.* ¶¶ 6, 34.) One of the men then shot both Atkins and

Armstrong, killing Atkins. (*Id*. ¶ 6; Defs.' Stmt. Facts ¶ 35.) Armstrong, who had been shot in

the head multiple times, survived the shooting. (Defs.' Stmt. Facts ¶¶ 35, 36.)

On the night of the shooting, Defendants Bohlen and Pinnow, who were the lead

detectives on the Atkins murder investigation, spoke to Armstrong about the crime while she

was in the hospital. (Pl.'s Stmt. Facts ¶¶ 8, 82; Defs.' Stmt. Facts ¶ 37.) Armstrong did not

identify any of the perpetrators at that time. (Pl.'s Stmt. Facts ¶ 8.) On December 28, 1993, Defendants Bohlen and Pinnow re-interviewed Armstrong. (*Id*. ¶ 10; Defs.' Stmt. Facts ¶¶ 4, 39.) During this interview, Armstrong informed Defendants Bohlen and Pinnow that four men were involved in the crime. (Defs.' Stmt. Facts ¶ 40.) She further explained that one person took Atkins out of the car at gunpoint and brought him into the alley and that the same person then took her down the alley to the garage. (Pl.'s Stmt. Facts ¶ 11.) Armstrong referred to this person as Offender #1 and was only able to describe Offender #1 as a black male. (*Id*.) Also, Armstrong provided a description of the second offender or Offender #2, who was the shooter, as about five feet, five inches to seven inches tall, with a medium build and that he was wearing a black hooded shirt with black pants. (*Id*. ¶ 12, R. 157-9, Ex. 9, Armstrong Dep., at 96-100; Defs.' Stmt. Facts ¶ 41.) She described the shooter as being about sixteen-years-old. (Pl.'s Stmt. Facts ¶ 12, Armstrong Dep., at 96-98.) Furthermore, Armstrong described Offender #3, the person who ordered the shooting, to Defendant Officers Bohlen and Pinnow. (Pl.'s Stmt. Facts ¶ 13.) Specifically, Armstrong described Offender #3 as a black male, who was six feet tall with a thin build, a mustache, and additional facial hair. (*Id*.) She told the officers that Offender #3 was wearing an olive knit hat and black and grey faded pants and that Offender #3 was the leader. (*Id*.; Defs.' Stmt. Facts ¶ 41.) Armstrong informed the officers that the fourth perpetrator acted as a lookout, although she could only identify this individual as male. (Pl.'s Stmt. Facts ¶ 14.) At the December 28, 1993 interview, Armstrong told Defendant Bohlen that "Green" – later identified as "Green Sallas" – may have been involved in shooting. (*Id*. ¶¶ 15, 72; R. 157-13, Bohlen Dep., at 161-62, 170.)

## IV.     Photographic Array

A few days after the hospital released Armstrong, she viewed a photographic array at her home on December 31, 1993.  (Pl.'s Stmt. Facts ¶ 21.)  Defendant Officers Bohlen and Pinnow included Sanders in the photographic array that Armstrong viewed.  (*Id.* ¶¶ 23-24.)  The parties dispute whether Defendant Bohlen received a tip from a confidential informant named Edward Villagomez implicating Sanders in the Atkins' murder and that this tip caused Defendant Bohlen to include Sanders in the photographic array.  (Def.'s Stmt. Facts ¶ 43.)  On December 31, 1993, Armstrong identified Sanders from the photographic array as Offender #3 – the offender who ordered the shooting.  (Pl.'s Stmt. Facts ¶ 25.)  Armstrong, however, had previously described Offender #3 as being six feet tall and thin, whereas Sanders was short and stocky at that time.  (*Id.* ¶¶ 25, 26.)  It is undisputed that Sanders' photograph in the array did not have a height indicator in it and that a photograph of his shoulder appeared next to the photograph of him facing the camera.  (*Id.* ¶ 27.)  Evidence in the record also indicates that the photograph of Sanders had a different background than the five other photographs in the array and that Sanders' photograph was a Polaroid, whereas the other photographs were police mug shots.  (*Id.* ¶ 28.)

## V.     Physical Line-Up

On January 14, 1994, Armstrong went to the Chicago Heights Police Department to view a physical line-up conducted by Defendants Pinnow and Goss.  (Pl.'s Stmt. Facts ¶¶ 29, 33; Defs.' Stmt. Facts ¶¶ 5, 60.)  When conducting the physical line-up, Detective Pinnow contacted Armstrong to view the line-up, participated in or arranged a gathering of individuals to go in the line-up, structured the line-up, and presented the line-up to Armstrong.  (Defs.' Stmt. Facts ¶ 60.)

Upon arriving at the police department, Defendant Bohlen told Armstrong that they had someone in custody for the Atkins murder. (Pl.'s Stmt. Facts ¶ 29.) The parties dispute whether Defendant Bohlen informed Armstrong of Sanders' name – either when she was viewing the photographic array or at the live line-up. (*Id.*; Defs.' Stmt. Facts ¶¶ 52, 61.) Armstrong identified Sanders from the physical line-up. (Pl.'s Stmt. Facts ¶ 29.) After the live line-up, Chicago Heights Police arrested Sanders on January 14, 1994, after which Defendants Bohlen and Pinnow interrogated him. (*Id.* ¶ 45.)

## VI.    Germaine Haslett

Germaine Haslett was also a member of the Gangster Disciples in the south suburbs and, during the relevant time period, held a lower rank in the gang than Sanders. (Pl.'s Stmt. Facts ¶ 16; Defs.' Stmt. Facts ¶ 34.) The record also contains evidence that Haslett was a police informant. (Pl.'s Stmt. Facts ¶ 55; Defs.' Stmt. Facts ¶ 77.) On January 14, 1994, Defendants Pinnow and Bohlen arrested Germaine Haslett pursuant to an outstanding warrant and then interrogated him. (Pl.'s Stmt. Facts ¶¶ 46, 47; Defs.' Stmt. Facts ¶¶ 54, 57.) At the time of his arrest, Haslett was with Sanders at a dry cleaners in Chicago Heights where Defendant Pinnow worked as a security officer. (Defs.' Stmt. Facts ¶¶ 54, 55.) The parties do not dispute that during the interrogation, Haslett told Defendants Pinnow and Bohlen that he was involved in the Atkins murder. (Defs.' Stmt. Facts ¶ 58.) It is also undisputed that Haslett was well acquainted with both Defendants Pinnow and Bohlen. (Pl.'s Stmt. Facts ¶ 48.)

The parties, however, dispute whether Defendants Bohlen and Pinnow directed Haslett to implicate Sanders in the Atkins murder. (Pl.'s Stmt. Facts ¶¶ 53, 54.) There is evidence in the record, for example, that in 1994 Haslett called his friend Wendy Jones from the Cook County

Jail and told Jones that he was manipulated into implicating Sanders in the Atkins murder, although Defendants assert that Sanders forced Haslett to make this call. (*Id.* ¶ 39.) There is also evidence in the record that Defendants Pinnow and Bohlen threatened to make Haslett's life miserable if he refused to implicate Sanders, and promised Haslett a reduced sentence if he did implicate Sanders. (*Id.* ¶ 54.) Pursuant to a plea agreement that he made with the Cook County State's Attorney's Office, Haslett received a reduced sentence of twelve years in the Atkins murder for testifying against Sanders. (Defs.' Stmt. Facts ¶ 72.) They also promised him that he would not serve his term in an Illinois prison. (*Id.*) The parties dispute whether Haslett was paid money or conferred any other benefits in connection with his testimony against Sanders at the 1995 criminal prosecution. (*Id.* ¶ 74.)

According to Defendant Bohlen, while interrogating Haslett, Haslett told the officers that two of the offenders in the Atkins murder were William Jamison and Robert Phason and that Phason was the shooter. (Pl.'s Stmt. Facts ¶ 57.) There is evidence in the record that Chicago Heights police officers did not follow-up with this lead or question Jamison or Phason about the murder. (*Id.* ¶¶ 57, 76, 77.) Also, the parties dispute whether Haslett informed Defendants Pinnow and Bohlen that another individual, Johnny Savage, was involved in the Atkins murder. (*Id.* ¶ 49.) Defendant Officers did not question Savage about the Atkins murder. (*Id.* ¶ 79.)

**VII.   Daubert Ruling**

On May 2, 2016, the Court granted in part and denied in part Defendant Chicago Heights' motion brought under *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), concerning Sanders' police practices expert Dr. William T. Gaut. Pertinent to the present summary judgment motion, Dr. Gaut offers opinions as to relevant

8

professional standards and identifies departures from these standards concerning identification procedures and other police investigation practices. The Court presumes familiarity with its May 2, 2016 Memorandum, Opinion, and Order, including the Court's discussion of Dr. Gaut's qualifications and opinions.

## VIII. Remaining Counts in the Second Amended Complaint

In Count I of his Second Amended Complaint, Sanders alleges that Defendants violated his Fourteenth Amendment due process rights by deliberately withholding exculpatory evidence, fabricating evidence, and employing unduly suggestive identification procedures. Sanders further alleges that Defendant Chicago Heights is liable for these due process violations under *Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), based on the City's failure to sufficiently train and supervise its police officers. In Count III, Sanders alleges that prior to arresting him, Defendant Officers Pinnow, Bohlen, and Mangialardi reached an agreement to frame him for murder and attempted murder, thus depriving him of his constitutional rights. In Count X, Sanders alleges a common law malicious prosecution claim, and in Count XI, he alleges a common law intentional infliction of emotional distress claim against Defendant Officers Pinnow and Bohlen.[1]

---

[1] The Court granted Plaintiff's motion to voluntarily dismiss Defendant Maureen Teed, an FBI Agent, on October 15, 2014, therefore, Plaintiff's claims brought under *Bivens v. Six Unknown Federal Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.E.2d 619 (1971), are no longer pending. On November 7, 2014, the Court granted – with prejudice – Defendants' Rule 12(b)(6) motion to dismiss Plaintiff's stand-alone supervisory liability claim alleged in Count VII and Plaintiff's 42 U.S.C. § 1983 malicious prosecution claim as alleged in Count VIII. In addition, because Plaintiff did not respond to Defendants' summary judgment arguments regarding his failure to intervene claim as alleged in Count V, Plaintiff has waived this claim. *See Citizens for Appropriate Rural Roads v. Foxx,* 815 F.3d 1068, 1078 (7th Cir. 2016).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Life Plans, Inc. v. Security Life of Denver Ins. Co.,* 800 F.3d 343, 349 (7th Cir. 2015). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). "To survive summary judgment, the non-moving party must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial." *Life Plans, Inc.*, 800 F.3d at 349.

## ANALYSIS

### I.    Due Process Right to a Fair Trial – Count I

In Count I of his Second Amended Complaint, Sanders alleges that Defendants violated his Fourteenth Amendment due process right to a fair trial by deliberately withholding exculpatory evidence, fabricating evidence, and employing unduly suggestive identification

procedures.

## A.    Brady Claim

Sanders first asserts that Defendant Officers Bohlen and Pinnow violated his Fourteenth Amendment due process right to a fair trial by deliberately withholding exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See Saunders-El v. Rohde,* 778 F.3d 556, 561 (7th Cir. 2015) ("A criminal defendant's *Brady* right is one that 'the Constitution provides as part of its basic 'fair trial' guarantee.'") (quoting *United States v. Ruiz*, 536 U.S. 622, 626, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002)). The duty to disclose under *Brady* applies to police officers. *See Youngblood v. W. Virginia,* 547 U.S. 867, 869-70, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) (per curiam); *Newsome v. McCabe,* 256 F.3d 747, 752-53 (7th Cir. 2001). "A plaintiff must show three elements in order to prove a *Brady* violation: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) the evidence must have been material, meaning there is a reasonable probability that the result of the proceeding would have been different." *Beaman v. Freesmeyer,* 776 F.3d 500, 506 (7th Cir. 2015). Under the last element, a plaintiff "need only show that the new evidence undermines the confidence of the verdict." *Id.* (citation omitted); *see also Wearry v. Cain*, 136 S.Ct. 1002, 1006 (2016) (per curiam) (petitioner "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict."). When determining if a *Brady* violation occurred, "the cumulative effect of all suppressed information should be considered, and an omission is 'evaluated in the context of the entire record.'" *Beaman,* 776 F.3d at 507 (quoting *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)); *see*

*also Kyles v. Whitley,* 514 U.S. 419, 421, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

Here, Sanders has presented evidence – albeit disputed – that Defendant Officers suppressed Haslett's statement that an individual named Johnny Savage participated in the Atkins murder. There is further evidence in the record that Armstrong picked Haslett out of a photographic array and that Defendant Officers never informed Sanders' trial counsel that Armstrong had done so. (Pl. Stmt. Facts ¶ 48.) Sanders further sets forth evidence that Defendant Officers withheld the fact that Armstrong initially implicated a man named Green (later identified as "Green Sallas") in the murder. There is also evidence in the record that Haslett told the officers that two of the offenders in the Atkins murder were William Jamison and Robert Phason and that Phason was the shooter – yet Defendant Officers did not disclose this information to Sanders' counsel. Furthermore, Sanders has offered evidence raising a reasonable inference that Defendants Bohlen and Pinnow hid the measures they used to induce Haslett to falsely implicate him, such as threatening to make Haslett's life miserable if he did not implicate Sanders.

Viewing the evidence and all reasonable inferences in Sanders' favor – as the Court is required to do at this procedural posture – and looking at this new evidence collectively and in the context of the entire record, Defendant Officers' suppression of this evidence is material for *Brady* purposes because it undermines the confidence in the jury's 1995 guilty verdict. *See Wearry,* 136 S.Ct. at 1006. Specifically, the fact that Armstrong had initially implicated "Green" in the murder and picked Haslett out of a photographic array would have been key impeachment evidence at trial, namely, Sanders' counsel would have had the opportunity to combat Armstrong's identification evidence with the fact that she had implicated others perpetrators

during the police investigation. Also, Sanders' counsel could have introduced evidence that Savage, Phason, and Jamison were also involved in the murder to undermine the State's theory that there were only four perpetrators to the murder, including Sanders as the leader and Haslett as the lookout, raising the inference that Sanders was not involved in the Atkins murder. Without this evidence, counsel did not have the means to significantly challenge Armstrong's identification of Sanders as a perpetrator to the crime nor the tools to undermine the State's theory of the case, especially because the State did not present any physical evidence linking Sanders to the crime. Likewise, that Defendant Officers induced Haslett to implicate Sanders casts doubt on Sanders' involvement in the Atkins murder, supports an inference of police misconduct, and undermines Haslett's credibility. Haslett's credibility at trial was crucial because he corroborated Armstrong's identification of Sanders and placed Sanders at the scene of the crime.

For the first time in their reply brief, Defendant Officers argue that Sanders cannot establish a *Brady* violation because Sanders had the suppressed evidence in his possession prior to his first criminal trial in January 1995. *See United States v. Walker,* 746 F.3d 300, 306 (7th Cir. 2014) (under *Brady*, "even if the government failed to disclose material evidence, the evidence is not 'suppressed' if the defendant knew of the evidence and could have obtained it through the exercise of reasonable diligence."). Not only are arguments made for the first time in a reply brief waived, *see United States v. Lacy*, 813 F.3d 654, 658 (7th Cir. 2016), but Defendant Officers do not explain how Sanders (or Sanders' counsel) knew that Haslett told Defendant Officers about Savage's participation in the murder, that Armstrong picked Haslett out of a photographic array during the investigation of the Atkins murder, that Armstrong

initially implicated a man named Green, that Haslett implicated Phason and Williams in the crime, or how Defendant Officers induced Haslett to implicate Sanders in the murder prior to Sanders' January 1995 trial. Instead, they surmise that because Haslett and Sanders had the same lawyer, the lawyer knew this information – despite the fact that evidence in the record suggests that Defendant Officers never revealed this information to counsel in the first place. In addition, Defendant Officers point to Sanders' 2011 appellate brief concerning his Illinois post-conviction petition for the proposition that Sanders knew Defendant Officers pressured Haslett to lie about Sanders' involvement. Defendant Officers' distinction that Sanders knew at the time of his trial that Haslett was telling an allegedly fabricated story is misplaced because Sanders' argument is that he did not know *how* Defendant Officers induced Haslett to testify against him. Nevertheless, after a careful reading of Sanders' 2011 appellate brief, it does not support the argument that Sanders knew how the officers induced Haslett into implicating him prior to his 1995 criminal trial.

Similarly unavailing is Defendant Officers' argument that they were not required to investigate Sanders' defense nor investigate other perpetrators once the officers had established probable cause to arrest Sanders. *See Stokes v. Bd. of Educ. of the City of Chicago,* 599 F.3d 617, 624 (7th Cir. 2010) ("While an officer may not close his or her eyes to clearly exculpatory facts, the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation."). Sanders is not bringing a Fourth Amendment claim – nor could he. *See Wallace v. Kato,* 549 U.S. 384, 394, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007); *Newsome,* 256 F.3d at 750-52.

The Court therefore denies Defendant Officers' summary judgment motion as to Sanders' *Brady* claim because Sanders has present sufficient evidence raising genuine issues of material fact for trial that Defendants Officers suppressed materially favorable evidence from Sanders and his counsel undermining the confidence of the 1995 guilty verdict.

**B.     Fabricating Evidence Claim**

Next, Sanders argues that Defendant Officers Pinnow and Bohlen violated his due process right because they induced Haslett to manufacture false testimony about Sanders' involvement in the Atkins murder.  "[A] police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way."  *Saunders-El*, 778 F.3d at 560 (quoting *Whitlock v. Brueggemann,* 682 F.3d 567, 580 (7th Cir. 2012)); *see also Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) (*Fields II*).  As the Seventh Circuit recently observed, "[a]llegations of evidence fabrication may state a colorable due-process claim in the wake of our decisions in *Whitlock* and *Fields II*," but "an act of evidence fabrication doesn't implicate due-process rights *unless* the fabricated evidence 'is later used to deprive the [criminal] defendant of her liberty in some way.'"  *Bianchi v. McQueen,* ___ F.3d ___, 2016 WL 1213270, at *7 (7th Cir. Mar. 29, 2016) (emphasis in original) (quoting *Whitlock*, 682 F.3d at 580).

Examining the facts and all reasonable inferences in Sanders' favor, he has presented evidence raising triable material facts that Defendant Officers directed Haslett to fabricate evidence that Sanders was a participant in the Atkins murder resulting in Haslett's trial testimony against Sanders at his 1995 criminal trial.  As noted directly above, the record contains evidence that Defendant Officers withheld information about Savage's participation in the

murder and that Defendant Officers did not investigate Phason and Williams after Haslett implicated them, which leads to a reasonable inference that Defendant Officers ignored other perpetrators in order to pin the murder on Sanders. There is also evidence in the record, viewed in Sanders' favor, that Defendants Pinnow and Bohlen threatened to make Haslett's life miserable if he refused to implicate Sanders and possibly conferred other benefits upon Haslett to induce him to do so. Construing all factual inferences in favor of Sanders, a reasonable jury could find that Defendant Officers pressured Haslett into falsely implicating Sanders in the Atkins murder. Moreover, because Haslett testified against Sanders at his 1995 criminal trial, the allegedly fabricated story of the murder presented through Haslett's trial testimony was instrumental in Sanders' conviction depriving him of his liberty. *See Saunders-El*, 778 F.3d at 560-61; *Whitlock,* 682 F.3d at 582. Accordingly, the Court denies Defendant Officers' motion as to Sanders' fabrication due process claim.

### C. Suggestive Identification Claim

As to Sanders' last due process claim, he contends that Defendant Officers photographic array and physical line-up were unduly suggestive. "The Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality," but it does "guarantee the right to a fair trial – in this context, via the due process clause of the Fourteenth Amendment – and that right is violated if unduly suggestive identification techniques are allowed to taint the trial." *Alexander v. City of S. Bend,* 433 F.3d 550, 555 (7th Cir. 2006). More specifically, a "witness's identification violates a defendant's right to due process when the identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Lee v. Foster,* 750 F.3d 687, 691 (7th Cir. 2014)

(citation omitted); *see also Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) ("It is the likelihood of misidentification which violates a defendant's right to due process."). "Due process will only prohibit evidence when it 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Lee,* 750 F.3d at 691 (quoting *Perry v. New Hampshire,* 132 S. Ct. 716, 722 (2012)). When determining if an identification procedure reaches this substantial threshold, courts engage in a two-step analysis. *See Lee*, 750 F.3d at 691. "First, [courts] determine whether the identification procedure was suggestive and unnecessary." *Id.*; *see also Perry*, 132 S. Ct. at 724. Second, courts "determine under the totality of the circumstances whether the procedure was nonetheless reliable." *Lee,* 750 F.3d at 691; *see also Alexander,* 433 F.3d at 555 ("Both suggestiveness and reliability are evaluated by reference to the totality of the circumstances."). In short, "the situation must have involved 'improper state conduct' – one in which the circumstances did not justify law enforcement's suggestive behavior." *United States v. Sanders*, 708 F.3d 976, 984 (7th Cir. 2013) (citation omitted).

As the Seventh Circuit directs, the Court first addresses whether the identification procedures at issue were suggestive and unnecessary. *See Lee*, 750 F.3d at 691. In support of his argument that the photographic array and physical line-up were unnecessarily suggestive, Sanders provides evidence in the form of the eyewitness identification expert opinion of Dr. Geoffrey Loftus – that Defendant Officers did not challenge under *Daubert.* Dr. Loftus opined that the line-up techniques Defendant Officers used were biased because: (1) Defendant Officers knew the identity of the suspect; (2) Sanders appears to be the tallest in the photo array because his image takes up the entire vertical extent of the photo; (3) Sanders' photo in the photographic

17

array was the only one that depicted a man with chin hair; and (4) Sanders was the only person who appeared in both the photographic array and the physical line-up. (Pl.'s Stmt. Facts ¶¶ 107, 108; R. 157-60, Loftus Expert Rep., at 3.)

Defendant Officers attempt to refute Dr. Loftus' opinion by asserting that Dr. Loftus "testified that there was nothing in the record that he reviewed that would lead him to believe that any of the officers made any misrepresentations in the identification process or did anything intentionally to suggest the identification" of Sanders. (Defs.' Stmt. Facts ¶ 91.) Defendant Officers' version of Dr. Loftus' deposition testimony is inaccurate. The deposition testimony upon which Defendant Officers rely states:

> Q: Okay. I understand that; but even based upon reading the transcripts of the officers and the eyewitness, you can't sit here today and say whether or not anything they did was an intentional or overt suggestive act?
>
> A: No, I can't – I can't say that they did and I can't say that they didn't.

(R. 143-27, Ex. Z, Loftus Dep., at 43.) Based on this testimony, Defendant Officers' argument is without merit because Dr. Loftus did not testify that Defendant Officers' conduct was not intentional in relation to the suggestiveness of the identification procedures. Rather, he testified that he could not say whether it was or was not intentional. Moreover, as explained in the Court's *Daubert* order, "[a]lthough under Rule 704(a) an expert may testify to the ultimate issue in a case, the expert's testimony need not relate to the ultimate issue in order to be relevant under Rule 702." *Smith v. Ford Motor Co.*, 215 F.3d 713, 721 (7th Cir. 2000). Therefore, Dr. Loftus was not required to testify that Defendant Officers' conduct was intentional, as Defendants suggest.

Sanders further sets forth additional expert evidence to support this claim, namely, the

opinion testimony of Dr. Gaut, his police practices expert. As part of his expert opinion that Defendants did not challenge under *Daubert*, Dr. Gaut posits that the procedures Defendant Officers used for the photographic array and live line-up were improper in relation to relevant professional standards. (R. 157-27, Ex. 27, Gaut Expert Rep., at 32.) Dr. Gaut specifically opines that the following deviations from accepted professional standards were improper: (1) there was no blind administrator showing the photo array; (2) there was no documentation of the photo array procedure; (3) there were no instructions given to the witness when showing the photo array; (4) the photographs were not reasonably similar in age, height, weight, and general appearance; (5) of the six photographs, Sanders wore a distinctive shirt compared to the others; (6) the descriptive information of the filler subjects in the photo array was not documented for comparison to Sanders; (7) only Sanders' photograph contained an error image that included a secondary shoulder or arm; (8) only Sanders' picture was cropped or elongated so that his head touched the top of the frame (making him appear tall and slim); (9) only Sanders' photograph showed a moustache or chin hair – all others were either clean shaven or had full beards; (10) Sanders' photograph was the only shot without any identifiers as a "mug shot" or "height" in the background; and (11) there was no contemporaneous confidence in Armstrong's identification. (Pl.'s Stmt. Facts ¶ 31, Gaut Rep., at 37.) Sanders also points to Dr. Gaut's opinion that Defendants Officers violated generally accepted law enforcement standards while conducting the physical line-up because Sanders was the only person from the photo array who was also in the live line-up, and that they failed to ask for Armstrong's level of certainty. (Pl.'s Stmt. Facts ¶

32.)[2]

Because Sanders has presented evidence in the form of Dr. Gaut's and Dr. Loftus' expert opinions that the photographic array and physical line-up were outside of generally accepted professional standards and biased, he has presented sufficient evidence raising a reasonable inference that these identification procedures were unnecessarily suggestive. *See Jimenez v. City of Chicago,* 732 F.3d 710, 721-22 (7th Cir. 2013). Therefore, the Court must "determine under the totality of the circumstances whether the procedure was nonetheless reliable." *See Lee,* 750 F.3d at 691; *see also Sanders,* 708 F.3d at 984 (courts "examine the 'totality of the circumstances' to determine whether other indicia of reliability 'outweigh[ ] ... the corrupting effect of law enforcement suggestion.'") (citation omitted). "The Supreme Court set forth several factors for courts to use to determine whether an unduly suggestive identification procedure was still to be considered reliable under the circumstances: (1) the opportunity of the witness to observe the criminal at the time of the crime (or prior to the identification); (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the identification; and (5) the length of time between the crime and the identification." *Lee,* 750 F.3d at 692 (citing *Biggers,* 409 U.S. at 199-200); *see also Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The Court turns to these reliability factors.

Evidence in the record, examined in Sanders' favor, reveals that after Armstrong had

---

[2] For the first time in their reply brief, Defendant Officers argue that Dr. Gaut "does not point to actual statements by Defendants to opine that their acts were intentional." Defendant Officers have waived this argument for failing to bring it in their opening brief. *See United States v. Lacy*, 813 F.3d 654, 658 (7th Cir. 2016).

been asleep in Atkins' car while they were parked in an alley, the perpetrators took Armstrong and Atkins down the alley into a dark garage where Atkins was shot dead and Armstrong was shot several times suffering severe head injuries.  On the day of the shooting, Armstrong initially identified Offender #3 as six feet tall and thin, whereas Sanders was short and stocky in December 1993.  Based on these facts, a reasonable jury could infer that Armstrong had a diminished opportunity to observe the crime, lacked attention to detail, and that her prior identification of Offender #3 did not meet Sanders' description.  As to the level of certainty demonstrated by Armstrong at the time of the identification procedures, although Defendant Officers assert that Armstrong picked Sanders out of the photo array and live line-up within seconds, there is no evidence in the record that Defendant Officers attempted to discern her degree of certainty when she identified Sanders.  Under the last reliability factor, the photographic array occurred two and a half weeks after the shooting and Defendant Officers conducted the physical line-up a month after the Atkins murder, which is not a long time span under the circumstances.  *See Biggers,* 409 U.S. at 201; *United States v. Miller,* 795 F.3d 619, 629 (7th Cir. 2015).  Considering these reliability factors as a whole, however, Sanders has presented disputed material evidence that Armstrong's identification of him was unreliable. Because Sanders has presented evidence raising triable issues that the identification procedures were unnecessarily suggestive, Armstrong's identification of him was unreliable, and that Armstrong's identification evidence – that the State presented at his trial – tainted his criminal trial, Sanders has established his suggestive identification due process claim.  *See Lee,* 750 F.3d at 691; *Alexander*, 433 F.3d at 555.

Nonetheless, Defendant Officers argue that qualified immunity protects them from liability as to Sanders' due process claim based on the allegedly suggestive identification procedures. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes,* ___ U.S. ___, 135 S.Ct. 2042, 2044, 192 L.Ed.2d 78 (2015) (internal quotation marks omitted). In evaluating qualified immunity, courts consider: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Locke v. Haessig,* 788 F.3d 662, 667 (7th Cir. 2015).

Because the Court has determined that Sanders has set forth sufficient evidence raising a genuine issue of material fact for trial that Defendant Officers violated his due process rights by employing unnecessarily suggestive identification procedures, the Court addresses whether this due process right was clearly established at the time of the alleged violations in December 1993 and January 1994. *See Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). In support of their argument, Defendant Officers maintain that because there is no set of universally adopted police identification procedures, they are shielded by qualified immunity. In other words, Defendant Officers argue that at the time of the identification procedures at issue, there were no established guidelines for them to follow. Defendant Officers, however, admit that it is "well established that an officer should not do anything overtly or intentionally to cause the witness to identify a suspect in a photo array or line-up." (R. 140, Defs.' Opening Brief, at 23.)

Defendants' argument about established police procedures misses the mark because whether there were generally accepted police practices for conducting identification procedures does not speak to whether it was clearly established in December 1993 and January 1994 that police officers violated a criminal defendant's due process rights by conducting impermissibly suggestive identification procedures. Indeed, it has been clearly established since at least 1977 that a criminal defendant has a due process right not to be subjected to unduly suggestive identifications that taint his criminal trial. *See Brathwaite,* 432 U.S. at 116; *Biggers,* 409 U.S. at 198. As such, Defendant Officers' qualified immunity argument fails.

On a final note, there is no evidence in the record linking Defendant Officer Goss to the alleged deprivation of Sanders' due process rights except that he assisted Defendant Officers Pinnow and Bohlen in the live line-up and testified at his deposition that he did not have training on how to conduct a line-up. (Pl.'s Stmt. Facts ¶ 33; Defs.' Stmt. Facts ¶ 5.) Without more, Sanders has not established that Defendant Goss was personally involved in the deprivation of his constitutional rights. *See Minix v. Canarecci,* 597 F.3d 824, 833 (7th Cir. 2010) ("individual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation'") (citation omitted). The Court therefore dismisses Defendant Goss with prejudice as a named Defendant from this lawsuit.

### D.  Monell Claim Against Chicago Heights

The Court next considers whether Sanders has presented sufficient evidence to withstand Defendant Chicago Heights' summary judgment motion as to its liability under *Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To recover against Defendant Chicago Heights, Sanders must establish that (1) he suffered a deprivation of

a constitutional right, (2) as a result of an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority, that was (3) the cause of his constitutional injury.  *See Rossi v. City of Chicago,* 790 F.3d 729, 737 (7th Cir. 2015); *King v. Kramer,* 763 F.3d 635, 649 (7th Cir. 2014).  Also, Sanders must show that the policy, custom, or practice was the moving force behind the deprivation of his constitutional rights.  *See Glisson v. Indiana Dept. of Corr.,* 813 F.3d 662, 666-67 (7th Cir. 2016); *Pyles v. Fahim,* 771 F.3d 403, 409-10 (7th Cir. 2014).

In his Second Amended Complaint, Sanders alleges that Defendant Officers' misconduct was a result of the Chicago Heights Police Department's unconstitutional, widespread practices regarding criminal investigations that were so well-settled that these practices constituted a de facto policy and that Chicago Heights' failure to properly train its officers caused these unlawful practices.  "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  *Connick v. Thompson,* 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011); *Burritt v. Ditlefsen,* 807 F.3d 239, 252 (7th Cir. 2015). Under this standard, a local government's failure to train must amount to the deliberate indifference of the rights of the citizens whom the officers encounter.  *See Connick,* 563 U.S. at 61 (citing *Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). "Deliberate indifference" is a term used in both Eighth Amendment claims and constitutional actions against municipalities.  *See Farmer v. Brennan,* 511 U.S. 825, 841, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  Specifically, "deliberate indifference serves under the Eighth Amendment to ensure that only inflictions of punishment carry liability."  *Id.*  On the other hand, the "term

was used in the *Canton* case for the quite different purpose of identifying the threshold for holding a city responsible for the constitutional torts committed by its inadequately trained agents." *Id.* (citation omitted); *see also Matthews v. City of E. St. Louis,* 675 F.3d 703, 709 (7th Cir. 2012) ("an inadequacy in police training can serve as a basis for liability under Section 1983, but only where the failure to train amounts to deliberate indifference to the citizens the officers encounter."). Proof of deliberate indifference in the context of a failure to train case "can take the form of either (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers." *Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1029-30 (7th Cir. 2006).

In support of its motion, Defendant Chicago Heights' summary judgment briefs are cursory – consisting of a total of three pages – and incorporate the arguments it made in its *Daubert* motion. Neither set of briefs, however, points to evidence in the record supporting the City's argument that it is not liable under *Monell* – nor does the City's fully develop its legal and factual arguments in its legal memoranda. For sake of completeness, however, the Court examines whether Sanders has presented sufficient evidence to raise triable issues of fact that Defendant Chicago Heights' failure to properly train its police officers amounted to the deliberate indifference to the rights of the persons with whom the City's police officers encountered. *See Canton,* 489 U.S. at 38; *Matthews,* 675 F.3d at 709.

As explained in detail in the Court's May 2, 2016 Memorandum, Opinion, and Order granting in part and denying in part Chicago Heights' *Daubert* motion, Sanders has presented the opinion evidence of Dr. Gaut, who will testify to the relevant professional standards and identify departures from these standards, including that the City's practices led to violations of generally

accepted police standards in relation to training police officers in conducting identification procedures, the use of confidential informants, and other aspects of police investigative procedures. *See Jimenez,* 732 F.3d at 721; *Roundy's Inc. v. N.L.R.B.,* 674 F.3d 638, 648 (7th Cir. 2012). In the *Daubert* ruling, the Court concluded that Dr. Gaut could not testify to legal conclusions, including that the City's policies and practices amounted to deliberate indifference in a constitutional sense. The Court, however, also concluded that Dr. Gaut could testify to the relevant professional standards and identify departures from these standards, including that the City's widespread practices regarding criminal investigations led to violations of generally accepted police standards. By doing so, Dr. Gaut's testimony "regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights." *Jimenez,* 732 F.3d at 721-22.

Construing the facts and all reasonable inferences in his favor, Sanders has presented sufficient evidence to survive summary judgment that Defendant Officers violated his right to due process when Defendants withheld material exculpatory and impeachment evidence, employed unduly suggestive identification procedures to induce Armstrong's false identification, and fabricated evidence in an effort to frame him. Sanders has also offered facts that there was a history of corruption within the Chicago Heights Police Department, as evidenced by an FBI investigation into the department during the relevant time period, putting City officials on notice of the police department's inadequate training. *See Sornberger,* 434 F.3d at 1029-30. Further, Sanders provides expert evidence that the City's failure to train resulted in and fostered a

widespread practice upon which a reasonable, properly instructed jury could infer that the City's conduct evinces a deliberate indifference to the rights of its citizens and was the moving force behind the deprivation of Sanders' due process rights. Because Sanders has submitted specific evidence showing that there are material factual issues for trial as to Defendant Chicago Heights' liability under *Monell*, the Court denies Chicago Heights' summary judgment motion.

## II.     Conspiracy Claim – Count III

In Count III, Sanders alleges that prior to arresting him, Defendant Officers Pinnow, Bohlen, and Mangialardi reached an agreement to frame him for the Atkins murder by violating his due process rights. "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman,* 776 F.3d at 510. It is well-settled in this Circuit that "[t]o be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir. 1988). An agreement or understanding to deprive a plaintiff of his constitutional rights "may be inferred from circumstantial evidence, but only if there is sufficient evidence that would permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." *Sow v. Fortville Police Dept.,* 636 F.3d 293, 305 (7th Cir. 2011) (citation omitted); *see also Beaman,* 776 F.3d at 511 ("Because conspiracies are often carried out clandestinely and direct evidence is rarely available,

plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative.").

First, Defendant Officers' argument that they cannot be held liable for the alleged conspiracy because there was no underlying constitutional violation is without merit because Sanders has presented sufficient evidence raising triable issues of fact that Defendant Officers Pinnow and Bohlen violated his Fourteenth Amendment due process rights. *See Sow,* 636 F.3d at 305 ("absence of any underlying violation of Plaintiff's rights precludes the possibility of Plaintiff succeeding on a conspiracy claim"); *Smith v. Gomez,* 550 F.3d 613, 617 (7th Cir. 2008) ("[C]onspiracy is not an independent basis of liability in § 1983 actions."). Also, as discussed immediately above, Sanders' *Monell* claim survives the City's summary judgment motion.

Second, Defendant Officers assert that the facts in the record do not support the inference that they acted "in concert with a premeditated plan" to deprive Sanders of his constitutional rights. Sanders, on the other hand, argues that at the time of his 1994 arrest there was widespread corruption within the Chicago Heights Police Department involving a pay-to-play kickback scheme in which Defendants Officers Pinnow, Bohlen, and Mangialardi fostered and took part. Sanders contends that this kickback scheme involved Chicago Heights police officers taking money from drug dealers in exchange for protecting the drug dealers from criminal charges. Further, Sanders asserts that Defendant Mangialardi created the kickback scheme.

Needless to say, the facts Sanders relies upon to support this theory of liability are hotly contested, although the Court takes judicial notice that Defendant Mangialardi was convicted on charges related to a kickback scheme with a drug dealer named Otis Moore for activity that occurred prior to Defendant Mangialardi's August 1993 indictment. (*See* 93 CR 0560-1; *see*

*also* Pl.'s Stmt. Facts ¶ 95.)  It is undisputed, however, that Defendant Mangialardi was suspended from the Chicago Heights Police Department in August 1993 because he had been indicted on federal criminal charges, and that during the investigation of the Atkins murder, Defendant Mangialardi did not supervise any police department employees and did not actively investigate the Atkins murder by interviewing witnesses or preparing reports.  Moreover, there is no evidence in the record that Defendant Mangialardi and Sanders interacted with each other in any such kickback scheme.  Indeed, there is undisputed evidence that Defendant Mangialardi and Sanders had never met and had never talked to each other.  (Defs.' Stmt. Facts ¶ 21; R. 157-2, Ex. 2, Sanders Dep., at 301.)

After a thorough review of the record, Sanders' position that Defendant Mangialardi was personally involved in a conspiracy with Defendants Bohlen and Pinnow to deny him his due process rights thus framing him for the Atkins murder asks the Court to draw unreasonable inferences based on speculation.  *See Beaman,* 776 F.3d at 511; *see also Boss v. Castro,* 816 F.3d 910, 916 (7th Cir. 2016) (at summary judgment, courts "construe all inferences in the non-movant's favor, but he is not entitled to the benefit of inferences that are supported only by speculation or conjecture.").  Although Sanders points to Defendant Mangialardi's connection to Johnny Savage, who Haslett allegedly implicated in the Atkins murder, this connection is too attenuated to link Defendant Mangialardi to Defendant Officer Pinnow's and Bohlen's alleged misconduct in denying Sanders' due process rights.  The fact that Defendant Mangialardi may have fostered the kickback scheme and did nothing to stop it could be relevant to supervisory liability in the abstract, *see Mayes v. City of Hammond, Ind.,* 442 F.Supp.2d 587, 635 (N.D. Ind. 2006), but Sanders has failed to establish that Defendant Mangialardi played any supervisory

role in connection with the alleged deprivation of his due process rights in this matter. *See Matthews*, 675 F.3d at 708. Sanders' argument that Defendant Mangialardi is liable because he created the kickback scheme fares no better because Sanders has not sufficiently linked Defendant Officer Pinnow's and Bohlen's misconduct in relation to him with Defendant Mangialardi's earlier extortion involving other drug dealers. To clarify, Sanders has presented evidence raising a triable issue of fact that Defendant Pinnow told him that he would have to pay kickbacks in order to sell drugs in Chicago Heights and that thereafter Sanders made two payments to Defendant Pinnow, but could not make any further payments. (Pl.'s Stmt. Facts ¶ 101.) That Defendant Pinnow asked Sanders for kickbacks like Defendant Mangialardi did with other drug dealers in the past does not establish a connection between Defendant Mangialardi's prior misconduct and Defendant Pinnow's misconduct in relation to Sanders. If that were the case, all other indicted and convicted Chicago Heights officials and police officers would also be liable to Sanders, a proposition that is untenable.

In addition, Sanders has not presented evidence creating a triable issue of fact that Defendant Mangialardi – who was suspended from the Chicago Heights Police Department at the time – was a final policy-maker under the circumstances. *See Vodak v. City of Chicago,* 639 F.3d 738, 748 (7th Cir. 2011). Therefore, his reliance on two unpublished district court cases involving the City of Chicago for the proposition that supervisory employees can be held liable under the circumstances are not persuasive because they pertain to Superintendents of the Chicago Police Department, who had final policy-making authority and were sued in their official capacity. *See Smith v. City of Chicago*, No. 15 C 3467, 2015 WL 6859299, at *6 (N.D. Ill. Nov. 9, 2015); *Davis v. City of Chicago,* No. 03 C 2094, 2003 WL 21781898, at *2 (N.D. Ill.

July 30, 2003).  Likewise, Sanders' reliance on an unpublished case involving a deliberate

indifference medical need claim, *see Farmer,* 511 U.S. at 841, against the Sheriff of Cook

County, also a final policy-maker sued in his official capacity, is equally unavailing. *See*

*Ebrahime v. Dart,* No. 09 C 1534, 2012 WL 33053, at *10 (N.D. Ill. Jan. 6, 2012).  Indeed,

under the circumstances, even if Sanders had brought his claim against Defendant Mangialardi in

his official capacity, any such claim is a claim against Chicago Heights because Defendant

Mangialardi was the City's agent. *See Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099,

87 L.Ed.2d 114 (1985).  The Court therefore grants Defendant Mangialardi's summary judgment

motion because Sanders has not provided evidence creating an issue of material fact for trial that

Defendant Mangialardi was personally involved or sufficiently connected to the deprivation of

his constitutional rights.

Although Sanders has failed to present evidence that Defendant Mangialardi conspired to

deny his due process rights by framing him for the Atkins murder, Sanders has offered evidence

raising a genuine issue of material fact that Defendants Bohlen and Pinnow did conspire to frame

him.  There is evidence in the record that Defendants Bohlen and Pinnow bore a grudge against

Sanders raising a reasonable inference that Defendant Officers had a motive to retaliate against

Sanders.  Furthermore, Sanders has offered evidence raising the inference that Defendant

Officers Bohlen and Pinnow – in tandem – withheld material evidence, induced Haslett to

fabricate testimony about Sanders' involvement, and conducted unduly suggestive identification

procedures implicating Sanders, thus framing Sanders for the Atkins murder.  This

circumstantial evidence sufficiently shows that Defendant Bohlen and Pinnow voluntary

participated in a scheme to violate Sanders' due process rights in an effort to frame him for the

Atkins murder and acted on that scheme.  *See Beaman,* 776 F.3d at 511; *Jones*, 856 F.2d at 992.

Accordingly, the Court denies Defendant Officers' summary judgment motion as to Sanders'

conspiracy claim alleged in Count III of the Second Amended Complaint.

### III.     Personal Involvement – Defendants Nardoni, Rubestelli, and Murphy

Because a § 1983 plaintiff cannot rely on a theory of respondeat superior, government

officials – including supervisors – are only liable for an alleged constitutional deprivation

through their own conduct.  *See Perez v. Fenoglio,* 792 F.3d 768, 781 (7th Cir. 2015); *Matthews,*

675 F.3d at 708.  "To show personal involvement, the supervisor must 'know about the conduct

and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'"

*Matthews,* 675 F.3d at 708 (quoting *Jones v. City of Chicago,* 856 F.2d 985, 992-93 (7th Cir.

1988)); *see also Vance v. Peters,* 97 F.3d 987, 991 (7th Cir. 1996) ("Section 1983 creates a cause

of action based on personal liability and predicated upon fault; thus, liability does not attach

unless the individual defendant caused or participated in a constitutional deprivation.") (citation

omitted).

It is undisputed that Defendants Anthony Murphy and Joseph Rubestelli did not actively

participate in the Atkins murder investigation.  (Defs.' Stmt. Facts ¶ 10.)  In addition, Sanders

did not address Defendants' arguments concerning the lack of personal involvement of

Defendants Chief Nardoni, Lieutenant Murphy, and Sergeant Rubestelli in his response brief.

As such, Sanders has waived his constitutional claims against Chief Nardoni, Lieutenant

Murphy, and Sergeant Rubestelli.  *See Citizens for Appropriate Rural Roads v. Foxx,* 815 F.3d

1068, 1078 (7th Cir. 2016).  The Court therefore dismisses Defendants Nardoni, Murphy, and

Rubestelli with prejudice as named Defendants to this lawsuit.

**IV.    Malicious Prosecution Claim – Count X**

In Count X of the Second Amended Complaint, Plaintiff alleges a common law malicious prosecution claim against Defendant Officers Bohlen and Pinnow.  The elements of malicious prosecution in Illinois, include: (1) defendants commenced criminal proceedings; (2) termination of that matter in favor of the plaintiff; (3) the absence of probable cause; (4) the presence of malice; and (5) resulting damages.  *See Saunders-El,* 778 F.3d at 561.  "In a malicious prosecution case, probable cause is defined as 'a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged.'" *Williams v. City of Chicago,* 733 F.3d 749, 759 (7th Cir. 2013) (citation omitted); *see also Johnson v. Saville,* 575 F.3d 656, 659 (7th Cir. 2009).  "'It is the state of mind of the person commencing the prosecution that is at issue – not the actual facts of the case or the guilt or innocence of the accused.'"  *Williams*, 733 F.3d at 759 (quoting *Sang Ken Kim v. City of Chicago,* 368 Ill.App.3d 648, 654, 858 N.E.2d 569, 574 (1st Dist. 2006)).

Defendant Officers first assert that Sanders has failed to present evidence that they did not have probable cause to arrest him.  In particular, Defendant Officers argue that they have refuted Sanders' arguments about the suggestive identification procedures and "under-the-table" promises that they allegedly made to Haslett, and that Armstrong's identification evidence and Haslett's version of the events are sufficient to establish probable cause.  As discussed, however, taken in a light most favorable to Sanders, he has offered disputed evidence for trial that Defendant Officers employed suggestive photo and physical line-up procedures to induce Armstrong to implicate Sanders and recruited Haslett to claim that Sanders participated in the

Atkins murder.[3]  Accordingly, without the allegedly induced Armstrong identification and Haslett's fabricated story of Sanders' involvement in the Atkins murder, the remaining facts at the time of Sanders' January 14, 1994 arrest would not "lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged," *see Williams,* 733 F.3d at 759, especially because there was no physical evidence linking Sanders to the Atkins murder.  Based on the material disputed facts, construed in Sanders' favor, the question of probable cause is "a proper issue for a jury [because] there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them."  *Sornberger,* 434 F.3d at 1013-14 (citation omitted).

Furthermore, Defendant Officers contend that Sanders cannot establish that they acted with malice, once again arguing that Dr. Loftus did not testify that their conduct was intentional and that Haslett testified that Defendant Officers did not tell him to lie about the Atkins murder. "Malice is defined as the initiation of a prosecution for any reason other than to bring a party to justice," and "can be inferred when a defendant lacks probable cause and the circumstances indicate a lack of good faith."  *Holland v. City of Chicago,* 643 F.3d 248, 255 (7th Cir. 2011) (citation omitted).  Here, Sanders has offered evidence that Defendant Officers purposely framed him for murder because they had a grudge against him.  Under these circumstances, Sanders has sufficiently established that Defendant Officers acted with malice to defeat summary judgment on this state law claim.  Thus, the Court denies Defendant Officers' motion concerning Sanders'

---

[3]  The Court notes that Defendant Officers do not argue that they had probable cause to arrest Sanders based on the tip Defendant Bohlen received from his confidential informant Villagomez.  Viewing the facts in Sanders' favor, there are genuine issues of material fact whether Villagomez was Defendant Bohlen's confidential informant and that Villagomez provided any such tip in the first instance.

malicious prosecution claim as alleged in Count X of the Second Amended Complaint.

## V. Intentional Infliction of Emotional Distress Claim — Count XI

In Count XI, Plaintiff brings a common law intentional infliction of emotional distress ("IIED") claim against Defendant Officers Pinnow and Bohlen. "To recover on a claim for IIED, Illinois law requires a plaintiff to prove: (1) that the conduct was extreme and outrageous, (2) that the actor intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and, (3) that the conduct in fact caused severe emotional distress." *Bailey v. City of Chicago,* 779 F.3d 689, 696 (7th Cir. 2015). The tort of IIED does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Boston v. U.S. Steel Corp.,* 816 F.3d 455, 467 (7th Cir. 2016) (citation omitted). Instead, for "conduct to be extreme and outrageous it must go 'beyond all bounds of decency' and be 'considered intolerable in a civilized community.'" *Fox v. Hayes,* 600 F.3d 819, 842 (7th Cir. 2010) (citation omitted). The "extreme and outrageous character of a defendant's conduct may arise, not so much from what he says or does, but from the defendant's improper use of a position of power which gives him the ability to adversely affect the plaintiff's interests." *Id.* (citation omitted).

In their summary judgment motion, Defendant Officers argue that Sanders cannot establish that their conduct was intentional because Sanders' expert Dr. Loftus did not opine that there was any intentional conduct. Again, Defendant Officers rely on Dr. Loftus' testimony that he could not say whether Defendant Officers' conduct was or was not intentional in relation to the suggestive identification procedures. As discussed, Dr. Loftus was not required to testify that Defendant Officers' conduct was intentional nor was his testimony the only evidence in the

35

record that their conduct was intentional, such as their alleged involvement in Haslett fabricating trial testimony.

Further, Defendant Officers contend that their conduct was not extreme and outrageous because, at best, Sanders has only established that their investigation was incomplete and that they failed to "turn over every stone." Defendant Officers, however, are viewing the facts in their favor. At this procedure posture, the Court must examine the facts and all reasonable inferences in Sanders' favor. *See Celotex Corp.*, 477 U.S. at 255. In doing so, Sanders has offered evidence that Defendant Officers, who had a position of power over him, fabricated evidence by inducing Haslett to testify against him, withheld material evidence, and conducted unduly suggestive identification procedures when investigating the Atkins murder resulting in Sanders spending approximately 20 years in prison for a crime that he did not commit. Under these circumstances, Sanders has presented evidence raising a genuine issue of material fact for trial that Defendant Officers' conduct was extreme and outrageous. *See Carroccia v. Anderson,* 249 F. Supp. 2d 1016, 1028 (N.D. Ill. 2003) ("If, as alleged, defendants fabricated false or misleading evidence of Carroccia's guilt or concealed exculpatory evidence from prosecutors, that behavior is sufficiently 'outrageous' to support a claim for intentional infliction of emotional distress."); *Henry v. Ramos,* No. 97 C 4025, 1997 WL 610781, at *2 (N.D. Ill. Sept. 28, 1997) ("An average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen."). Based on this evidence, the Court denies Defendant Officers' summary judgment motion as to Sanders' IIED claim alleged in

Count XI of the Second Amended Complaint.[4]

## CONCLUSION

For these reasons, the Court denies Chicago Heights' summary judgment motion [147], grants in part and denies in part Defendant Officers' motion for summary judgment [139], and grants Defendant Mangialardi's summary judgment motion.  [142].

**Dated:**  May 17, 2016

ENTERED

**AMY J. ST. EVE**
**United States District Court Judge**

---

[4]  For the first time in their reply brief, Defendant Officers argue that Sanders' IIED claim is untimely under the relevant statute of limitations period.  Not only are arguments made for the first time in a reply brief waived, but Defendant Officers also waived any such argument because they failed to allege a statute of limitations affirmative defense in their pleadings.  *See Walker v. Sheahan,* 526 F.3d 973, 979 (7th Cir. 2008).