**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RODELL SANDERS,         ) | |
| ) | |
| Plaintiff,     ) | |
| ) | Case No. 13 C 0221 |
| v.       ) | |
| ) | |
| CITY OF CHICAGO HEIGHTS, et al.,     ) | |
| ) | |
| Defendants.     ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On July 8, 2016, Defendant City of Chicago Heights, Illinois ("Chicago Heights" or the "City") and individual Defendant Chicago Heights Police Officers Jeffrey Bohlen and Robert Pinnow moved to exclude the expert testimony of Plaintiff Rodell Sanders' police practices expert Dr. William T. Gaut and Plaintiff's eyewitness identification expert Dr. Geoffrey Loftus pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). This is Defendants' second *Daubert* motion concerning Dr. Gaut, and the Court presumes familiarity with its May 2, 2016 Memorandum Opinion and Order granting in part and denying in part the first *Daubert* motion. Also, the Court presumes familiarity with its May 17, 2016 Memorandum Opinion and Order granting in part and denying in part Defendants' summary judgment motions.[1] For the following reasons, the Court, in its discretion, denies the present *Daubert* motion because Sanders has met his burden

---

[1] The Court's earlier rulings control the present *Daubert* motion under the law of the case doctrine. *See Kathrein v. City of Evanston, Ill.*, 752 F.3d 680, 685 (7th Cir. 2014) (a "ruling made in an earlier phase of a litigation controls the later phases unless a good reason is shown to depart from it.").

of demonstrating that Dr. Gaut's and Dr. Loftus' expert testimony satisfies the standards for admissibility under *Daubert* and the Federal Rules of Evidence.

## BACKGROUND

### I.      Procedural Background

After being incarcerated for approximately 20 years, on July 22, 2014, a Circuit Court of Cook County jury acquitted Sanders on all criminal counts involving the 1993 murder of Philip Atkins and shooting of Stacy Armstrong. Originally, a Circuit Court of Cook County jury convicted Sanders of murder and attempted murder in January 1995. Thereafter, Sanders filed a successful post-conviction petition brought under the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, *et seq.,* in which the Circuit Court judge granted him a new trial based on defense counsel's constitutionally ineffective assistance of counsel in violation of the Sixth Amendment. The Illinois Appellate Court, First District, affirmed the Circuit Court, and the State retried Sanders in July 2014, at which time the jury acquitted him. The present civil rights lawsuit followed.

### II.      Factual Background

At the time of the December 1993 murder and resultant criminal investigation, Sanders was a high ranking member of the Gangster Disciples street gang in Chicago's south suburbs, which includes Chicago Heights. On December 14, 1993, Atkins was working at the Old Country Buffet restaurant in Matteson, Illinois, where Armstrong picked him up after he had finished work. From there, Atkins and Armstrong, who were dating, drove to a friend's house in Harvey, Illinois, a suburb near Chicago Heights. Around 2:00 a.m. on December 15, 1993, Atkins and Armstrong were in Armstrong's vehicle, which was parked in an alley near 1437

Portland Avenue in Chicago Heights. At that time, several males approached the vehicle and ordered Atkins and Armstrong out of the car at gunpoint. The men then escorted Armstrong and Atkins to a dark, secluded garage. Inside the garage, the men questioned Atkins about his gang affiliation, after which he revealed that he was a member of the Mickey Cobras – a rival gang of the Gangster Disciples. One of the men then shot both Atkins and Armstrong, killing Atkins. Armstrong survived.

Defendants Jeffrey Bohlen and Robert Pinnow were the lead detectives on the Atkins murder investigation. On the night of the shooting, Defendants Bohlen and Pinnow spoke to Armstrong about the crime while she was in the hospital. Armstrong did not identify any of the perpetrators at that time. On December 28, 1993, Defendants Bohlen and Pinnow re-interviewed Armstrong and during this interview, Armstrong informed them that four men were involved in the crime. She further explained that one person took Atkins out of the car at gunpoint and brought him into the alley and that the same person then took her down the alley to the garage. Armstrong referred to this person as Offender #1 and was only able to describe Offender #1 as a black male. Also, Armstrong provided a description of the second offender or Offender #2, who was the shooter, as about five feet, five inches to seven inches tall, with a medium build, and that he was wearing a black hooded shirt with black pants. She described the shooter as being about sixteen-years-old. Armstrong described Offender #3, the person who ordered the shooting, to Defendant Officers Bohlen and Pinnow. More specifically, Armstrong described Offender #3 as a black male, who was six feet tall with a thin build, a mustache, and additional facial hair. She told the officers that Offender #3 was wearing an olive knit hat and black and grey faded pants and that Offender #3 was the leader of the group. Armstrong also informed the officers that the

fourth perpetrator acted as a lookout, although she could only identify this individual as male.

A few days after the hospital released Armstrong, she viewed a photographic array at her home on December 31, 1993.  Defendant Officers Bohlen and Pinnow included Sanders in the photographic array that Armstrong viewed.  Armstrong then identified Sanders from the photographic array as Offender #3 – the offender who ordered the shooting.  Armstrong, however, had previously described Offender #3 as being six feet tall and thin, whereas Sanders was short and stocky at that time.  It is undisputed that Sanders' photograph in the array did not have a height indicator in it and that a photograph of his shoulder appeared next to the photograph of him facing the camera.  Evidence in the record also indicates that Sanders' photo had a different background than the other photographs in the array and that Sanders' photograph was a Polaroid rather than a police mug shot.

On January 14, 1994, Armstrong went to the Chicago Heights Police Department to view a physical lineup conducted by Defendant Pinnow and another detective.  Upon arriving at the police department, Defendant Bohlen told Armstrong that they had someone in custody for the Atkins murder.  The parties dispute whether Defendant Bohlen informed Armstrong of Sanders' name – either when she was viewing the photographic array or at the live lineup.  Armstrong identified Sanders from the physical lineup.  Chicago Heights Police then arrested Sanders, after which Defendants Bohlen and Pinnow interrogated him.

**III.     Dr. Loftus' Qualifications[2]**

Dr. Loftus is a Professor of Psychology at the University of Washington in Seattle

---

[2] Dr. Gaut's qualifications and list of his expert opinions are set forth in the Court's May 2, 2016 Memorandum Opinion and Order.  [184].

specializing in human perception and memory.  In 1967, Dr. Loftus received a B.A. in experimental psychology from Brown University and, in 1971, he received his Ph.D. in experimental psychology from Stanford University.  Dr. Lotus completed a postdoctoral fellowship at New York University in 1972 and then joined the faculty of the University of Washington, where he has taught and conducted research for over four decades.  In addition, Dr. Loftus has been a visiting professor at Stanford University and the Massachusetts Institute of Technology.  Dr. Loftus' doctoral dissertation concerned humans' ability to recall and recognize pictures from memory, and his subsequent studies in the field of human perception and scientific methodology have been published in numerous professional journals and books. *See* Loftus, G.R., Wells, G.L., & Stahl, M.B. (2013), "What Can We Learn About Real-Life Lineups from Experiments that use Real-Life Lineups?" *Law & Human Behavior* (in submission); Loftus, G.R. (2010), "What can a perception-memory expert tell a jury?" *Psychonomic Bulletin Review*, 17, 143-48; Loftus, G.R. & Harley, E.M. (2004), "How different spatial-frequency components contribute to visual information acquisition," *Journal of Experimental Psychology: Human Perception & Performance* 30, 104-18.

Over the past 30 years, Dr. Loftus has testified as an expert in perception and memory in approximately 385 cases.  These cases have been tried in state courts, United States federal courts, and in a United States military court. *See, e.g., Grant v. Stimson,* No. NMCM 96 01188, 1996 WL 927707, at *1 (U.S. Navy-M. Ct. Crim. App. June 28, 1996) ("Dr. Geoffrey Loftus, Ph.D., [is] a highly regarded expert in the area of memory and eyewitness identification."). Included in this experience is Dr. Loftus' expert opinion testimony in the Circuit Court of Cook County and in the United States District Court for the Northern District of Illinois.

**IV.    Dr. Loftus' Expert Opinions**

In his expert report, Dr. Loftus states that he based his expert opinions on police reports, a copy of the photo array, photos of the live lineup, interviews, depositions, excerpts of hearing and trial testimony, and photos of the relevant crime-scene area.  At his deposition, Dr. Loftus specifically explained that he reviewed Detective Bohlen's and Pinnow's depositions in this matter and the their 2014 trial testimony, as well Stacey Armstrong's deposition testimony and 2014 trial testimony.  In his report, Dr. Loftus opined as to two separate categories:  (1) Armstrong's identifications of Sanders were unreliable; and (2) the photographic array and physical lineup were unnecessarily suggestive.

As to his first opinion, Dr. Loftus explains that Armstrong's memory of the offender alleged to be Sanders was likely poor because during the time she was in contact with him, her ability to perceive and memorize would have been severely diminished because of lack of the adequate lighting, lack of attention on Armtrong's part to the offender's appearance, lack of adequate time to memorize the offender's appearance, and high stress on Armstrong's part – attributable to her having seen her boyfriend shot and killed and to having been shot herself. Furthermore, the feature of the offender's appearance about which Armstrong's description was most likely correct, namely, the offender's height, is inconsistent with Sanders' height, which provides evidence against the proposition that Sanders was the offender.

In support of his first opinion, Dr. Loftus opined on the ways in which human perception is fallible, including that:  (1) research indicates people pay attention to a weapon when a weapon is present at the expense of paying attention to the appearance of the person wielding the gun or anyone in the vicinity; (2) a witness' report about features such as height and build that

constitute global information is more reliable than a report about a person's facial appearance constituting local information; (3) a witness who is told that he has correctly identified a suspect undergoes memory changes and becomes more confident that he has properly identified the person who committed the crime; and (4) if a eyewitness receives false post-event information, he becomes more confident about his identification of the suspect.

Next, in his expert report, Dr. Loftus opined that the photo array and live lineup techniques Defendants Pinnow and Bohlen used were biased because: (1) Defendant Officers knew the identity of the suspect; (2) Sanders appears to be the tallest in the photo array because his image takes up the entire vertical extent of the photo; (3) Sanders' photo in the photographic array was the only one that depicted a man with chin hair; and (4) Sanders was the only person who appeared in both the photographic array and the physical lineup.

## DAUBERT STANDARD

"Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), govern the admission of expert testimony in federal courts." *C.W. ex rel. Wood v. Textron, Inc.,* 807 F.3d 827, 834 (7th Cir. 2015). "The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.,* 758 F.3d 810, 817 (7th Cir. 2014); *see also Higgins v. Koch Dev. Corp.,* 794 F.3d 697, 704 (7th Cir. 2015) ("Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable."). Although the Seventh Circuit reviews "the district court's application of *Daubert* [] de novo," if "the court

adhered to the *Daubert* framework, then its decision on admissibility is reviewed for abuse of discretion." *Estate of Stuller v. United States,* 811 F.3d 890, 895 (7th Cir. 2016).

A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012); *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony"). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley,* 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596). A district court's inquiry under *Daubert* is a flexible one and district courts have wide latitude in performing this gate-keeping function. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Hartman,* 758 F.3d at 818. "'[T]he key to the gate is not the ultimate correctness of the expert's conclusions,'" rather, "'it is the soundness and care with which the expert arrived at her opinion[.]'" *Wood*, 807 F.3d at 834 (citation omitted). The "proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009).

## ANALYSIS

### I.      Challenges to Dr. Loftus' Expert Opinions

In their *Daubert* motion, Defendants do not challenge Dr. Loftus' qualifications or experience. Instead, they argue that the Court should exclude Dr. Loftus' testimony on

eyewitness perception because it usurps the role of the jury as fact finder and does not offer any specialized knowledge unavailable to a layperson. Further, Defendants contend that the Court should exclude certain aspects of Dr. Loftus' testimony because it is speculative and does not rely upon sufficient facts or data. In short, Defendants argue that Dr. Loftus' opinions do not fulfill the *Daubert* standard for reliability, while other opinions are not helpful. *See Daubert,* 509 U.S. at 597 (district court must ensure that expert evidence "both rests on a reliable foundation and is relevant to the task at hand.").

### A.    Assist Trier of Fact – Relevancy

Defendants' argument that – "almost all" of Dr. Loftus' opinions as to what affected Armstrong's eyewitness perception are common sense observations – concerns *Daubert's* relevancy requirement. *See Jimenez v. City of Chicago,* 732 F.3d 710, 721 (7th Cir. 2013); Fed.R.Evid. 702(a). Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue,'" which "goes primarily to relevance." *Daubert*, 509 U.S. at 591. "An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014). "Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Matter of the Complaint of Ingram Barge Co.*, No. 13 C 3453, 2016 WL 3763450, at *10 (N.D. Ill. July 14, 2016) (citing *Sullivan v. Alcatel-Lucent USA Inc.,* No. 12 C 7528, 2014 WL 3558690, at *6 (N.D. Ill. July 17, 2014)); *see also Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (expert must testify to something more than what is obvious to layperson).

In their motion, Defendants argue that the general trend is "to preclude expert testimony on the reliability of witness identification on the ground that it invades the province of the jury as a trier of fact." *People v. McGhee,* 964 N.E.2d 715 (1st Dist 2012);[3] *see also United States v. Carter,* 410 F.3d 942, 950 (7th Cir. 2005) ("jurors understand that memory can be less than perfect"); *but see United States v. Bartlett,* 567 F.3d 901, 906 (7th Cir. 2009) ("It will not do to reply that jurors know from their daily lives that memory is fallible."). Despite Defendants' argument to the contrary, Seventh Circuit case law does not reflect a "general trend" to exclude expert testimony regarding eyewitness identifications – nor does Seventh Circuit case law support Defendants' argument that expert identification testimony is only necessary in "special situations."

More specifically, the Seventh Circuit has discussed expert testimony in relation to eyewitness identification evidence in detail and under various circumstances. *See United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009); *United States v. Williams,* 522 F.3d 809, 812 (7th Cir. 2008); *Newsome v. McCabe,* 319 F.3d 301, 306 (7th Cir. 2003). In *Bartlett*, the Seventh Circuit explained:

> It will not do to reply that jurors know from their daily lives that memory is fallible. The question that social science can address is *how* fallible, and thus how deeply any given identification should be discounted. That jurors have beliefs about this does not make expert evidence irrelevant; to the contrary, it may make such evidence vital, for if jurors' beliefs are mistaken then they may reach incorrect conclusions. Expert evidence can help jurors evaluate whether their beliefs about the reliability of eyewitness testimony are correct. Many people believe that identifications expressed with certainty are more likely to be correct; evidence that there is no relation between certitude and accuracy may have a

---

[3] "In Illinois, the admission of expert testimony is governed by the standard expressed in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923)." *People v. Holmes,* 48 N.E.3d 185, 211 (1st Dist. 2016).

powerful effect.

*Id.* at 906 (emphasis in original).  The Seventh Circuit has also reasoned that "[i]f there is one thing known about eyewitness identification, it is that 'common sense' misleads more often than it helps."  *Williams*, 522 F.3d at 811.  The Seventh Circuit in *Williams* further articulated:

> The problem with "common sense" is that experience tells us what leads to *confidence* about whether we have seen a given person before but does not provide reliable ways to test whether that confidence is justified.  People confuse certitude with accuracy and so are led astray.  Psychologists have established that certitude often is unwarranted.

*Id.* (emphasis in original); *see also Webster v. Daniels,* 784 F.3d 1123, 1143 (7th Cir. 2015) ("We have often pointed out the dangers of relying on 'common sense' when social science reveals that common assumptions are wrong.").  In addition, the Seventh Circuit has discussed the fallibility of eyewitness identification testimony in the context of a finding of probable cause for arrest:

> [N]othing is obvious about the psychology of eyewitness identification.  Indeed, one point well established in the psychology literature is that most people's intuitions on the subject of identification are wrong.  *See* Christopher Chabris & Daniel Simons, *The Invisible Gorilla: How Our Intuitions Deceive Us* (2010). We held in *United States v. Williams,* 522 F.3d 809 (7th Cir. 2008), that someone who contends that a particular kind of procedure led to an unreliable identification needs evidence – if not from an expert's affidavit, then from published work such as Elizabeth F. Loftus, et al., *Eyewitness Testimony: Civil and Criminal* (4th ed. 2007), the standard text in this field.

*Phillips v. Allen,* 668 F.3d 912, 916 (7th Cir. 2012).

In sum, the Seventh Circuit's guidance in the field of human perception and eyewitness identification teaches that nothing is obvious about the psychology of eyewitness identification, evaluating the fallibility of eyewitness testimony often takes more than common sense, and expert evidence helps jurors evaluate the reliability of eyewitness testimony by taking into

account the psychology of eyewitness identification.  *See id.*; *Bartlett*, 567 F.3d at 906.

Moreover, federal courts look favorably upon eyewitness expert testimony under the

circumstances of this civil lawsuit, namely, where there is a single eyewitness who is unfamiliar

with the alleged perpetrator.  *See Cage v. City of Chicago,* 979 F. Supp. 2d 787, 838-39 (N.D. Ill.

2013) ("the Seventh Circuit has been receptive to eyewitness identification expert testimony in

the civil arena"); *Newsome,* 319 F.3d at 306 (7th Cir. 2003) (expert eyewitness identification

testimony "was not a distraction in this civil proceeding but went to an important ingredient of

the plaintiff's claim"); *Cf. Bartlett,* 567 F.3d at 907 ("scholarly work concerns identification by

*single* eyewitnesses, not the probability of error when multiple witnesses identify the same

person.") (emphasis in original).  As Defendants point out, the Court must nevertheless weigh

the probative value of any such expert testimony under Federal Rule of Evidence 403.  *See*

*Bartlett,* 567 F.3d at 906 (courts "must balance the benefits of illuminating evidence against the

costs of collateral inquiries"); *see also Williams*, 522 F.3d at 812 ("This is not at all to say that

counsel must present experts, or even social-science evidence, in every case," rather "judges

should take account of these matters when thinking about the issue and informing juries.").

Under the circumstances of this civil lawsuit, Sanders has established that Dr. Loftus'

expert testimony would be helpful to the trier of fact in relation to understanding Sanders'

arguments as to why Armstrong's identification of him was unreliable – despite Armstrong's

insistence that her identification of Sanders was accurate.  Dr. Loftus will opine on the ways in

which human perception is fallible, including that (1) research indicates people pay attention to a

weapon when a weapon is present at the expense of paying attention to the appearance of the

person wielding the gun or anyone in the vicinity, (2) a witness' report about features such as

height and build that constitute global information is more reliable than a report about a person's facial appearance constituting local information, (3) a witness who is told that he has correctly identified a suspect undergoes memory changes and becomes more confident that he has properly identified the person who committed the crime, and (4) if a eyewitness receives false post-event information, he becomes more confident about his identification of the suspect. This evidence is highly probative, especially in light of extensive research showing that eyewitness identifications are fallible. *See Williams,* 522 F.3d at 811 ("Perceptual biases and errors are endemic to identification. The normal way of dealing with them is to expose the problem at trial so that a discount may be applied to the testimony, rather than to exclude relevant evidence.") (internal citations omitted); *United States v. Brown,* 471 F.3d 802, 804 (7th Cir. 2006) ("Even under the best circumstances, the probability of erroneous identification of a stranger seen briefly is uncomfortably high."). Simply put, Dr. Loftus' expert testimony will help the jurors evaluate the testimony regarding eyewitness identification and whether their beliefs about the reliability of eyewitness testimony are correct. *See Barlett,* 567 F.3d at 906.

As *Barlett* directs, the Court next turns to whether Dr. Loftus' expert testimony is admissible under Rule 403. Defendants do not explain how Dr. Loftus' probative expert testimony is substantially outweighed by the danger of unfair prejudice or juror confusion – although they acknowledge that the Court must make evidentiary determinations in light of Rule 403. *See United States v. Boswell*, 772 F.3d 469, 476 (7th Cir. 2014) ("most relevant evidence is, by its very nature, prejudicial" therefore "evidence must be *unfairly* prejudicial to require exclusion") (emphasis in original) (citation omitted). In other words, Defendants do not argue or establish that Dr. Loftus' expert opinion testimony is unfairly prejudicial under Rule 403 because

13

it would induce the jury to decide this lawsuit on an improper basis. *See United States v. Schmitt*, 770 F.3d 524, 535 (7th Cir. 2014); *see also Common v. City of Chicago,* 661 F.3d 940, 947 (7th Cir. 2011) (Evidence is "unfairly prejudicial in the context of Rule 403 if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented."). Instead, Defendants oversimplify Dr. Loftus' expert opinion by arguing that it is not beyond the ken of the average juror that poor lighting and having a gun pointed at you is distracting.

Because Dr. Loftus' expert testimony on eyewitness identification will assist the trier of fact and is not unfairly prejudicial, the Court, in its discretion, denies this aspect of Defendants' *Daubert* motion. *See Bartlett,* 567 F.3d at 906 ("That jurors have beliefs about [eyewitness testimony] does not make expert evidence irrelevant; to the contrary, it may make such evidence vital, for if jurors' beliefs are mistaken then they may reach incorrect conclusions.").

**B.**     **Reliability**

Next, the Court turns to Defendants' argument that some of Dr. Loftus' opinions are not supported by the record and are speculative, which speaks to the reliability requirement under *Daubert* and Rule 703. *See Stuhlmacher,* 774 F.3d at 409 ("Expert testimony is admissible at trial if the testimony is relevant to a fact in issue, is based on sufficient facts or data, and is the product of reliable scientific or other expert methods that are properly applied."); *see also Brown v. Burlington No. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) ("Rule 703 requires the expert to rely on 'facts or data,' as opposed to subjective impressions"). Although an expert's opinion must be founded on sufficient facts or data, *see Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887, 894 (7th Cir. 2011), "[t]he soundness of the factual underpinnings of the expert's

analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Manpower, Inc. v. Ins. Co. of Penn.,* 732 F.3d 796, 806 (7th Cir. 2013) (citation omitted). A "district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Higgins,* 794 F.3d at 704 (citation omitted).

In their *Daubert* motion, Defendants seek to bar Dr. Loftus' expert opinion that certain aspects of the photo array at issue drew attention to Sanders, including that the photograph of Sanders was partially repeated, that he was the only individual in the photo array with a goatee, and that he was the only individual wearing a sweater. Specifically, Defendants argue that Dr. Loftus' opinion is boilerplate language that he uses in all of his expert reports and that Dr. Loftus does not point to any specific research or literature supporting his conclusions. *See Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999) ("Either 'hands-on testing' or 'review of experimental, statistical, or other scientific data generated by others in the field' may suffice as a reasonable methodology upon which to base an opinion.") (citation omitted).[4]

After a thorough review of Dr. Loftus' expert report and deposition testimony, Dr. Loftus based his expert opinions on reliable data and a multitude of studies generated by scientific professionals in the field of eyewitness identification, as well as his own experimental work and professional studies in human perception and memory over the last 40 years, as cited throughout his report and at his deposition, including the standard in the field of eyewitness identification,

---

[4] Defendants do not argue that Dr. Loftus was required to conduct a laboratory experiment to form his opinions. *See Manning v. Buchan,* 357 F. Supp. 2d 1036, 1044 (N.D. Ill. 2004) ("the Seventh Circuit has made it clear that an expert is not required to substantiate his opinions through testing particularized to the specific case if the science he is using has already been shown experimentally to be reliable.").

Elizabeth F. Loftus, *et al.*, *Eyewitness Testimony: Civil and Criminal* (3d. ed. 1997). *See Kumho Tire*, 526 U.S. at 152 (*Daubert* gatekeeping function "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."); *Walker v. Soo Line R. Co.,* 208 F.3d 581, 588 (7th Cir. 2000) ("courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable"). At trial, Defendants may challenge the accuracy of the underlying data by cross-examination and confronting him with contrary evidence. *See Daubert,* 509 U.S. 596; *Lapsley*, 689 F.3d at 805. Also, that Dr. Loftus expressed his opinions using the parlance of his area of study does not make his opinions "boilerplate" as Defendants assert. The Court, in its discretion, therefore denies Defendants' *Daubert* motion in this respect.

## II.    Challenges to Dr. Gaut's Expert Opinions

As discussed, Defendants seek to bar Dr. Gaut's expert opinion testimony for the second time in this litigation. In response to the present *Daubert* motion concerning Dr. Gaut, Sanders argues that Defendants have forfeited their opportunity to challenge any additional opinions for failing to bring these arguments in their first *Daubert* motion seeking to exclude Dr. Gaut's expert opinions. *See Third Wave Tech., Inc. v. Stratagene Corp.*, 405 F.Supp.2d 991, 997 (W.D. Wis. 2005) ("Having failed to raise a *Daubert* challenge to [the expert's] testimony at the proper time, defendant forfeited its right to try to show that [the expert] was not qualified to testify at all or on specific topics."); *Cf. Kapco Mfg. Co. v. C & O Enter., Inc.,* 108 F.R.D. 55, 56 (N.D. Ill. 1985) (Rovner, J.) ("Principles of judicial economy and procedural fairness to the [parties] mandate that one judge consider all the issues between the parties at one time, thereby avoiding

piecemeal litigation and the danger of inconsistent results.").  Sanders' argument is not

unwarranted, especially because the City stated on the record that it was not challenging Dr.

Gaut's opinions regarding the photo array or lineup procedure at the April 20, 2016 *Daubert*

hearing.  (R. 185, 4/20/16, Tr., at 3-4.)  Nonetheless, for the sake of completeness, the Court

addresses Defendants' new arguments regarding Dr. Gaut's opinions.

Specifically, Defendants argue that Dr. Gaut, a police practices expert, does not have any

specific social science qualifications – such as that of a sociologist or psychologist – in the area

of reliability of eyewitness identification, therefore, he is not qualified to testify about this topic.

In his report, Dr. Gaut opines that properly trained police detectives would understand the

inherent problems with eyewitness identification because human perception, particularly under

stress, tends to be inaccurate.  Dr. Gaut also opines that under generally accepted police

practices, detectives should be trained to avoid certain "red flags" in order to eliminate witness

misidentification and protect the innocent from false arrest, including when a single eyewitness –

like Armstrong – sees the perpetrator in a "darkened atmosphere and under extreme stress."  In

another part of his report, Dr. Gaut states that based on the standards set by courts and

professional legal and law enforcement agencies, Defendant Detectives deviated from accepted

professional standards because:  (1) there was no blind administrator showing the photo array;

(2) there was no documentation of the photo array procedure; (3) there were no instructions

given to the witness when showing the photo array; (4) the photographs were not reasonably

similar in age, height, weight, and general appearance; (5) of the six photographs, Sanders wore

a distinctive shirt compared to the others; (6) the descriptive information of the filler subjects in

the photo array was not documented for comparison to Sanders; (7) only Sanders' photograph

contained an error image that included a secondary shoulder or arm; (8) only Sanders' picture was cropped or elongated so that his head touched the top of the frame (making him appear tall and slim); (9) only Sanders' photograph showed a moustache or chin hair – all others were either clean shaven or had full beards; (10) Sanders' photograph was the only shot without any identifiers as a "mug shot" or "height" in the background; and (11) there was no contemporaneous confidence in Armstrong's identification.

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy,* 593 F.3d 610, 618 (7th Cir. 2010) (internal quote and citation omitted). Here, the subject matter of Dr. Gaut's testimony is police practices – not psychology or sociology. He is not opining as to human perception and the psychology of eyewitness identification, but rather that Defendant Detectives deviated from accepted police practices in conducting the photo array and live lineup. As the Court explained in its earlier rulings, Dr. Gaut is qualified to testify to the relevant professional standards for police and identify departures from these standards, including that the City's practices led to violations of generally accepted police standards in relation to training police officers in conducting identification procedures and other aspects of police investigative procedures. By doing so, Dr. Gaut's testimony "regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights." *Jimenez,* 732 F.3d at 721-22; *see also Hobgood v. Illinois Gaming Bd.,* 731 F.3d 635, 645 (7th Cir. 2013) ("Significant, unexplained or

systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of [unlawful] intent.") (citation omitted). Defendants' argument that Dr. Gaut is not qualified to testify about Defendant Detectives' deviations from generally accepted police practices in the area of photo arrays and lineups is without merit. Accordingly, the Court, in its discretion, denies this aspect of Defendants' *Daubert* motion.

## III.     Standards Governing Photo Arrays and Live Lineups

Defendants next argue that the Court should exclude Dr. Loftus' and Dr. Gaut's expert opinion testimony concerning live lineups and photo arrays because the standards to which they opine were not established as the time of the Atkins murder investigation in 1994. In particular, Defendants argue that there were no "best practices" on eyewitness practices and procedures until 1999 when the National Institute of Justice ("NIJ"), part of the United States Department of Justice, set forth standards in the article "Eyewitness Evidence – A Guide for Law Enforcement." One of the issues in this lawsuit is whether Defendant Detectives' conduct deviated from reasonable professional standards, specifically generally accepted police practices, not whether Defendants deviated from some sort of universal standard set forth by the Department of Justice, as Defendants imply. *See Jimenez,* 732 F.3d at 721-22. Moreover, to argue that there were no generally accepted standards for police to follow in conducting photo arrays or live lineups prior to 1999 is disingenuous. The NIJ's publication "Eyewitness Evidence – A Guide for Law Enforcement" cites numerous pre-1999 articles and texts lending guidance to police practices in the context of eyewitness evidence in Appendix A.[5] In fact, in

---

[5] This additional reading includes Elizabeth F. Loftus, et al., *Eyewitness Testimony: Civil and Criminal* (3d ed. 1997), the standard text in this field as cited by the Seventh Circuit with approval. *See Phillips v. Allen,* 668 F.3d 912 (7th Cir. 2012); *United States v. Bartlett,* 567 F.3d

their legal memoranda, Defendants highlight pre-1999 publications discussing various standards for police lineups, and Dr. Loftus discussed other pre-1999 publications at his deposition in response to Defendants' questions about relevant police standards.  (R. 192-2, Dr. Loftus Dep., at 39-40.)

That certain practices may not have been generally accepted at the time of the Atkins murder investigation is fodder for cross-examination – not a basis for exclusion under *Daubert*. *See Lees v. Carthage College,* 714 F.3d 516, 526 (7th Cir. 2013) (defendant "is free to argue that community standards would have been a preferable benchmark, but that again is a matter of evidentiary weight, not admissibility.").  At trial, Defendants will have the opportunity to cross-examine Plaintiff's experts concerning their conclusions and the application of generally accepted standards that existed at the time of the murder investigation, as Defendants suggest by highlighting Dr. Loftus' deposition testimony regarding sequential and double blind lineups.  *See Daubert,* 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Defendants also point to debates or disputes within the psychological community regarding "how several aspects of conducting a lineup should be done so as to minimize error." It is not the Court's role – at this procedural posture – to decide between competing expert opinions or disputes within the psychological community as Defendants argue.  *See Schultz v. Akzo Nobel Paints, LLC,* 721 F.3d 426, 433 (7th Cir. 2013).  Rather, the strength or weaknesses of expert testimony goes to the weight of the evidence to be determined by the jury.  *See*

---

901, 906 (7th Cir. 2009).

*Manpower,* 732 F.3d at 806 ("The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed.").

The remainder of Defendants' arguments in their *Daubert* motion seek to either litigate the merits of the underlying lawsuit or question the correctness of the expert's conclusions, which are not within the province of a *Daubert* motion, but instead must be determined by the trier of fact. *See Wood,* 807 F.3d at 834; *see also Stollings*, 725 F.3d at 7665 ("trial judges acting as gatekeepers do not assume 'the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul" that would "inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury.") (citation omitted). Defendants, for example, argue that certain facts upon which Dr. Gaut relied in forming his expert opinion are not relevant or are disputed – such as the reason Defendant Bohlen placed Sanders in the photo array was due to a tip from Detective Bohlen's confidential informant. They further take issue with Dr. Gaut's citations in his expert report, arguing, for example, that Dr. Gaut "frequently nebulously refers to IACP 'Training Keys' or 'Model Policies' without a date attached throughout the report." Whether Dr. Gaut failed to properly cite to the authority he relied upon in his expert report is not a basis to exclude his expert testimony under *Daubert*. *See Stollings*, 725 F.3d at 765 ("The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony.").

On a final note, Defendants' argument that "the deficiencies with the photo array and the lineup outlined by Dr. Gaut do not rise to the requisite level of intent required in this case and are not relevant pursuant to Rules 702 and 401-403" is misplaced because expert "testimony

need not prove everything in order to be useful." *Newsome,* 319 F.3d at 306; *see also Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000) ("The expert need not have an opinion on the ultimate question to be resolved by the trier of fact in order in order to" assist the trier of fact.) For these reasons, the Court, in its discretion, denies Defendants' *Daubert* motion.

## CONCLUSION

For these reasons, the Court, in its discretion, denies Defendants' *Daubert* motion to exclude Dr. Loftus' and Dr. Gaut's expert testimony.

**Dated:** August 18, 2016

ENTERED

_____

**AMY J. ST. EVE**
**United States District Court Judge**