**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RODELL SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13 C 0221 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO HEIGHTS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On July 8, 2016, Plaintiff Rodell Sanders moved to exclude certain expert testimony of Defendant City of Chicago Heights' and individual Defendant Chicago Heights Police Officers' police practices expert John J. Ryan pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). For the following reasons, the Court, in its discretion, grants in part and denies in part Sanders' *Daubert* motion.[1]

**BACKGROUND**

After being incarcerated for approximately 20 years, on July 22, 2014, a Circuit Court of Cook County jury acquitted Sanders on all criminal counts involving the 1993 murder of Philip Atkins and shooting of Stacy Armstrong. Originally, a Circuit Court of Cook County jury convicted Sanders of murder and attempted murder in January 1995. Thereafter, Sanders filed a successful post-conviction petition brought under the Illinois Post-Conviction Hearing Act, 725

---

[1] The Court presumes familiarity with its earlier *Daubert* rulings in this matter, as well as the Court's May 17, 2016 Memorandum Opinion and Order granting in part and denying in part Defendants' summary judgment motions.

ILCS 5/122-1, *et seq.,* in which the Circuit Court judge granted him a new trial based on defense counsel's constitutionally ineffective assistance of counsel in violation of the Sixth Amendment. The Illinois Appellate Court, First District, affirmed the Circuit Court, and the State retried Sanders in July 2014, at which time the jury acquitted him. The present civil rights lawsuit followed.

At the time of the December 1993 murder and resultant criminal investigation, Sanders was a high ranking member of the Gangster Disciples street gang in Chicago's south suburbs, which includes Chicago Heights. On December 14, 1993, Atkins was working at the Old Country Buffet restaurant in Matteson, Illinois, where Armstrong picked him up after he had finished work. From there, Atkins and Armstrong, who were dating, drove to a friend's house in Harvey, Illinois, a suburb near Chicago Heights. Around 2:00 a.m. on December 15, 1993, Atkins and Armstrong were in Armstrong's vehicle, which was parked in an alley near 1437 Portland Avenue in Chicago Heights. At that time, several males approached the vehicle and ordered Atkins and Armstrong out of the car at gunpoint. The men then escorted Armstrong and Atkins to a dark, secluded garage. Inside the garage, the men questioned Atkins about his gang affiliation, after which he revealed that he was a member of the Mickey Cobras – a rival gang of the Gangster Disciples. One of the men then shot both Atkins and Armstrong, killing Atkins. Armstrong survived.

Defendants Jeffrey Bohlen and Robert Pinnow were the lead detectives on the Atkins murder investigation. On the night of the shooting, Defendants Bohlen and Pinnow spoke to Armstrong about the crime while she was in the hospital. Armstrong did not identify any of the perpetrators at that time. On December 28, 1993, Defendants Bohlen and Pinnow re-interviewed

2

Armstrong and during this interview, Armstrong informed them that four men were involved in the crime. She further explained that one person took Atkins out of the car at gunpoint and brought him into the alley and that the same person then took her down the alley to the garage. Armstrong referred to this person as Offender #1 and was only able to describe Offender #1 as a black male. Also, Armstrong provided a description of the second offender or Offender #2, who was the shooter, as about five feet, five inches to seven inches tall, with a medium build, and that he was wearing a black hooded shirt with black pants. She described the shooter as being about sixteen-years-old. Armstrong described Offender #3, the person who ordered the shooting, to Defendant Officers Bohlen and Pinnow. More specifically, Armstrong described Offender #3 as a black male, who was six feet tall with a thin build, a mustache, and additional facial hair. She also told the officers that Offender #3 was the leader of the group. Armstrong informed the officers that the fourth perpetrator acted as a lookout, although she could only identify this individual as male.

A few days after the hospital released Armstrong, she viewed a photographic array at her home on December 31, 1993. Defendant Officers Bohlen and Pinnow included Sanders in the photographic array that Armstrong viewed. Armstrong then identified Sanders from the photographic array as Offender #3 – the offender who ordered the shooting. Armstrong, however, had previously described Offender #3 as being six feet tall and thin, whereas Sanders was short and stocky at that time. It is undisputed that Sanders' photograph in the array did not have a height indicator in it and that a photograph of his shoulder appeared next to the photograph of him facing the camera. Evidence in the record also indicates that Sanders' photo had a different background than the other photographs in the array and that Sanders' photograph

was a Polaroid rather than a police mug shot.

On January 14, 1994, Armstrong went to the Chicago Heights Police Department to view a physical lineup conducted by Defendant Pinnow and another detective. Upon arriving at the police department, Defendant Bohlen told Armstrong that they had someone in custody for the Atkins murder. The parties dispute whether Defendant Bohlen informed Armstrong of Sanders' name – either when she was viewing the photographic array or at the live lineup. Armstrong identified Sanders from the physical lineup. Chicago Heights Police then arrested Sanders, after which Defendants Bohlen and Pinnow interrogated him.

In the meantime, Germaine Haslett was also a member of the Gangster Disciples in the south suburbs and, during the relevant time period, held a lower rank in the gang than Sanders. On January 14, 1994, Defendants Pinnow and Bohlen arrested Germaine Haslett pursuant to an outstanding warrant and then interrogated him. At the time of his arrest, Haslett was with Sanders at a dry cleaners in Chicago Heights where Defendant Pinnow worked as a security officer. There is no dispute that during the interrogation, Haslett told Defendants Pinnow and Bohlen that he was involved in the Atkins murder.

The parties, however, dispute whether Defendants Bohlen and Pinnow directed Haslett to implicate Sanders in the Atkins murder. There is also disputed evidence in the record that Defendants Pinnow and Bohlen threatened to make Haslett's life miserable if he refused to implicate Sanders and promised Haslett a reduced sentence if he did implicate Sanders. Pursuant to a plea agreement that he made with the Cook County State's Attorney's Office, Haslett received a reduced sentence of twelve years in the Atkins murder for testifying against Sanders. Also, he was promised that he would not serve his term in an Illinois prison. The parties dispute

4

whether Haslett was paid money or conferred any other benefits in connection with his testimony against Sanders at the 1995 criminal trial.

**II.     Ryan's Qualifications**

Defendants' expert rebuttal witness, John J. Ryan, has a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island and a Master of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island.  Also, Ryan has a Juris Doctor Degree from Suffolk University Law School in Boston, Massachusetts.  From 1993 until 2002, Ryan served as an adjunct faculty member in the Administration of Justice Program at Salve Regina University teaching graduate courses on Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law; and Business Crime.  Prior to 2002, Ryan was a Police Captain for the Providence Police Department in Providence, Rhode Island, where he served for twenty years.  Ryan is currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, G. Patrick Gallagher, and Lou Reiter.  As part of the Legal and Liability Risk Management Institute, Ryan conducts training for law enforcement agencies and jails.

Since 2000, Ryan has written several manuals for use by police officers, two of which are used by Rhode Island Law Enforcement agencies, namely, Rhode Island Law Enforcement Officers' Guide to Criminal Procedure (2000) and Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings (2000).  The Public Agency Training Council distributes Ryan's other manuals used in conjunction with training programs for public employees.  These manuals include:  Legal and Liability Issues in the Public Schools (2001);

Policy Development for Public Safety Agencies (2002); Civil Liability and Risk Management for Law Enforcement Agencies (2003); Use of Force (2004); Administrative Investigations In Law Enforcement Agencies (2004); Legal and Liability Issues for Hostage Negotiators (2005); Public Safety Media Relations (2005); Arrest Search and Seizure (2005); and Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation (2007, 2010, 2013).

Ryan has provided police practices expert opinions and testimony in several federal cases, including *M.H. v. Cnty. of Alameda,* 62 F. Supp. 3d 1049, 1071 (N.D. Cal. 2014); *Grant v. Winik*, 948 F. Supp. 2d 480, 489 (E.D. Pa. 2013); *Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 407 (D. Vt. 2009); and *Atwood v. Town of Ellington*, 468 F. Supp. 2d 340, 358 (D. Conn. 2007).

### III.     Ryan's Expert Opinions

In forming his opinions, Ryan relied upon (1) court documents in the present proceedings, including the original complaint and amended complaints; (2) the parties' discovery, such as answers to interrogatories, depositions, and deposition exhibits; (3) the 2014 criminal trial transcript; and (4) Dr. Geoffrey Loftus' and Dr. William Gaut's expert reports. Defendants offer Ryan's expert opinion in rebuttal to Sanders' police practices witness Dr. Gaut, who was the subject of two of Defendants' *Daubert* motions. In general, Defendants offer Ryan's testimony to rebut Dr. Gaut's opinion that certain aspects of the Atkins murder investigation violated generally accepted police practices.

In his *Daubert* motion, Sanders does not seek to exclude Ryan's expert opinion in its entirety. Instead, he delineates the exact expert opinions he is challenging, including Ryan's

6

opinion that "prior to bringing criminal charges, the investigators and the State's Attorney received a confession from Haslett in which he implicated himself in this crime. It is well known in law enforcement that when a subject implicates him or herself in the criminal activity the statements of the confessor generally have greater reliability." (R. 190-2, Ryan Rep., at 34.)

In addition, Sanders challenges Ryan's conclusion that Defendant Officers had probable cause to arrest Sanders. In particular, Ryan opined:

> It is my opinion, based upon my specialized background, training, education, and experience, as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that the arrest of Rodell Sanders was consistent with the generally accepted policies, practices, training, and legal mandates at the time this investigation was conducted.

(*Id.* at 36.) Ryan also stated: "A positive identification made by the victim of the crime would, in most cases be sufficient to establish probable cause for an arrest of Sanders." (*Id.* at 39-40.)

Furthermore, Sanders challenges Ryan's expert opinion concerning Defendants complying with "legal mandates," including: (1) Defendant Detectives' murder investigation was consistent with legal mandates; (2) the manner in which Defendants conducted the photo array and physical lineup was consistent with legal mandates; (3) Sanders' arrest was consistent with the legal mandates at the time of the investigation; (4) the manner in which Chicago Heights trained its police officers was consistent with the legal mandates at the time Defendants investigated the Atkins murder; (5) Chicago Heights' policies and lack of policies were consistent with the legal mandates during the relevant time period; and (6) probable cause is based on the totality of the circumstances. (*Id.* at 33, 36, 39-43.)

Sanders also seeks to exclude Ryan's opinion regarding the corruption within the Chicago Heights Police Department. More specifically, Ryan articulated: "While I note that

7

opinions are offered with respect to corruption within the Chicago Heights Police Department which appear to be supported by convictions of officers, I see no evidentiary connection made in the materials provided to date with the investigation of Mr. Sanders." (*Id*. at 44.)

## DAUBERT STANDARD

"Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), govern the admission of expert testimony in federal courts." *C.W. ex rel. Wood v. Textron, Inc.,* 807 F.3d 827, 834 (7th Cir. 2015). "The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.,* 758 F.3d 810, 817 (7th Cir. 2014); *see also Higgins v. Koch Dev. Corp.,* 794 F.3d 697, 704 (7th Cir. 2015) ("Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable."). Although the Seventh Circuit reviews "the district court's application of *Daubert* [] de novo," if "the court adhered to the *Daubert* framework, then its decision on admissibility is reviewed for abuse of discretion." *Estate of Stuller v. United States,* 811 F.3d 890, 895 (7th Cir. 2016).

A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012); *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony"). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to

8

be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley,* 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596). A district court's inquiry under *Daubert* is a flexible one and district courts have wide latitude in performing this gate-keeping function. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Hartman,* 758 F.3d at 818. "'[T]he key to the gate is not the ultimate correctness of the expert's conclusions,'" rather, "'it is the soundness and care with which the expert arrived at her opinion[.]'" *Wood*, 807 F.3d at 834 (citation omitted). The "proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009).

## ANALYSIS

In the present *Daubert* motion, Sanders does not challenge Ryan's qualifications or experience. Instead, Sanders contends that some of Ryan's opinions do not fulfill the *Daubert* standard for reliability and other opinions are not helpful or relevant. *See Daubert,* 509 U.S. at 597 (district court must ensure that expert evidence "both rests on a reliable foundation and is relevant to the task at hand."). Specifically Sanders argues that: (1) Ryan made improper credibility determinations and legal conclusions; and (2) Ryan lacks a sufficient basis to opine about the corruption within the Chicago Heights Police Department and its connection to the Sanders' criminal investigation.

### I. Assist Trier of Fact – Relevancy

Sanders' arguments regarding credibility determinations and legal conclusions go to the relevancy requirement under *Daubert* and Rule 702. *See Jimenez v. City of Chicago,* 732 F.3d

710, 721 (7th Cir. 2013); Fed.R.Evid. 702(a). Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue,'" which "goes primarily to relevance." *Daubert*, 509 U.S. at 591 (citation omitted). "An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case." *Stuhlmacher v. Home Depot U.S.A., Inc.,* 774 F.3d 405, 409 (7th Cir. 2014).

A. **Credibility Determinations**

It is well-settled that determining the weight and credibility of witness testimony is the exclusive province of the jury and that experts are not permitted to offer opinions as to the believability or truthfulness of witness testimony. *See United States v. Hall,* 165 F.3d 1095, 1107 (7th Cir. 1999) ("[T]he credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury – determining the credibility of witnesses."); *see also United States v. Scheffer,* 523 U.S. 303, 313, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) ("Determining the weight and credibility of witness testimony [] has long been held to be the 'part of every case [that] belongs to the jury.'") (citation omitted); *United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009) ("it is the jury's role to determine the credibility of the witnesses and weigh the evidence.").

In the present motion, Sanders argues that Ryan impermissibly seeks to bolster Germaine Haslett's testimony by opining that Haslett's testimony is credible because he implicated himself in the Atkins murder. In his expert report, Ryan states that "prior to bringing criminal charges, the investigators and the State's Attorney received a confession from Haslett in which he implicated himself in this crime. It is well known in law enforcement that when a subject implicates him or herself in the criminal activity the statements of the confessor generally have

greater reliability." Sanders specifically argues that this statement bolsters Haslett's testimony by providing an opinion that Haslett's testimony is reliable. In addition, Sanders argues that Ryan's opinion as to the truthfulness of Haslett's confession is inadmissible speculation.

While the Court agrees that Ryan cannot draw the conclusion that Haslett's testimony and confession are credible, Ryan can testify that "based upon my specialized background, training, education, and experience, as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices" that "when a subject implicates him or herself in the criminal activity the statements of the confessor generally have greater reliability." As the Court discussed in its earlier *Daubert* rulings in this matter, testimony that speaks to the relevant professional standards will provide the jury with a baseline when evaluating Defendants' conduct. *See Jimenez,* 732 F.3d at 721.

Ryan, however, cannot testify that Haslett's confession is truthful unless he can substantiate this unsupported speculation. *See Brown v. Burlington No. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) ("Rule 703 requires the expert to rely on 'facts or data,' as opposed to subjective impressions"). The Court also rejects Sanders' argument that whether Haslett's confession was truthful is not supported by the record because it "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Manpower, Inc. v. Ins. Co. of Penn.,* 732 F.3d 796, 806 (7th Cir. 2013) (citation omitted). Therefore, the Court, in its discretion, grants in part and denies in part this aspect of Sanders' *Daubert* motion.

**B.     Legal Conclusions**

Next, Sanders seeks to exclude certain opinions arguing that they are legal conclusions. As a general rule, an expert cannot offer legal opinions or conclusions. *See Jimenez,* 732 F.3d at 721; *see also Client Funding Solutions Corp. v. Crim,* 943 F. Supp. 2d 849, 863 (N.D. Ill. 2013) ("Opinions that amount to legal conclusions do not assist the trier of fact."). As the Seventh Circuit instructs, "[e]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003). Put differently, although Rule 704(a) "states that '[a]n opinion is not objectionable just because it embraces an ultimate issue,'" Rules 702 and 704, "prohibit experts from offering opinions about legal issues that will determine the outcome of a case." *Roundy's Inc. v. N.L.R.B.,* 674 F.3d 638, 648 (7th Cir. 2012); *see also King v. Kramer*, 763 F.3d 635, 646 (7th Cir. 2014).

As discussed in the Court's May 2, 2016 *Daubert* ruling, "[t]here is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts." *United States v. Blount,* 502 F.3d 674, 680 (7th Cir. 2007). In the context of constitutional tort claims, "[w]hen an expert offers an opinion relevant to applying a legal standard," the "expert's role is 'limited to describing sound professional standards and identifying departures from them.'" *Jimenez,* 732 F.3d at 721 (citation omitted). More specifically, "[e]xpert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights." *Id.* at 721-22.

### 1. Probable Cause

Sanders argues that Ryan's opinions about probable cause consist of impermissible legal conclusions. In particular, Sanders highlights the specific opinions he seeks to exclude, namely, that "the arrest of Rodell Sanders was consistent with the generally accepted policies, practices, training, and legal mandates at the time this investigation was conducted," and "[a] positive identification made by the victim of the crime would, in most cases be sufficient to establish probable cause for an arrest of Sanders."

In response, Defendants argue that "first, and foremost, Ryan is not opining as to probable cause. He is not opining that probable cause was established in this case at the time of Sanders' arrest. Sanders takes out one excerpt of one part of Ryan's opinion and misconstrues it." Here, Sanders is not nitpicking by highlighting Ryan's exact opinion nor is he misconstruing it, rather, he is arguing that the Court should exclude Ryan's legal conclusion that there was probable cause to arrest him. In other words, Sanders is not challenging the fact that Ryan is offering his opinions to rebut Dr. Gaut's opinion that the Atkins murder investigation violated generally accepted investigation procedures – he is simply pointing out the parts of Ryan's expert opinion that he believes are inadmissible under *Daubert* and the Federal Rules of Evidence.

The Court agrees that Ryan cannot testify that there was probable cause to arrest Sanders because it is a legal conclusion, which is outcome determinative because probable cause is a necessary element of Sanders' common law malicious prosecution claim. *See Roundy's Inc.,* 674 F.3d at 648; *Good Shepherd Manor,* 323 F.3d at 564. Also, Ryan cannot testify to the legal standards of what constitutes probable cause, including the "totality of the circumstances" test.

*See United States v. Lupton,* 620 F.3d 790, 800 (7th Cir. 2010) (expert opinion explaining the law to the jury is "a subject for the court, not for testimonial experts.") (quotation omitted); *United States v. Caputo,* 382 F.Supp.2d 1045, 1049 (N.D. Ill. 2005) ("An expert witness cannot offer an opinion on what the law requires or permits because the judge, not the witnesses, instructs the jury about the relevant law."). It is the jury's role to determine probable cause after the Court carefully instructs them on the controlling law, and thus any such legal opinions are not only inadmissible, but would have the tendency to confuse the jury as to their role in the proceedings. *See Lupton,* 620 F.3d at 799-800 (expert's legal interpretation would confuse jury). As such, the Court, in its discretion, grants this aspect of Sanders' *Daubert* motion.

### 2. Legal Mandates

In his *Daubert* motion, Sanders also seeks to exclude Ryan's opinions in which he posits that Defendants' conduct was consistent with "legal mandates." These opinions include: (1) Defendant Detectives' murder investigation was consistent with legal mandates; (2) the manner in which Defendants conducted the photo array and physical lineup was consistent with legal mandates; (3) Sanders' arrest was consistent with the legal mandates at the time of the investigation; (4) the manner in which Chicago Heights trained its police officers was consistent with the legal mandates at the time Defendants investigated the Atkins murder; and (5) Chicago Heights' policies and lack of policies were consistent with the legal mandates during the relevant time period. In these opinions, Ryan also states that Defendants' conduct was consistent with "the generally accepted policies, practices, and training at the time." Sanders does not challenge this aspect of Ryan's opinions because they are appropriate pursuant to Seventh Circuit case law. *See Jimenez,* 732 F.3d at 721-22 ("[e]xpert testimony regarding relevant professional standards

can give a jury a baseline to help evaluate whether a defendant's deviations from those standards").

In response, Defendants do not address Sanders' arguments that these opinions are legal conclusions that would confuse the jury and that Ryan is in no better position than the jury in determining whether Defendants comported with any such "legal mandates." Instead, Defendants argue that Ryan's opinions rebut Dr. Gaut's opinions – which Sanders recognizes by not challenging Ryan's conclusions that Defendants' conduct was consistent with "the generally accepted policies, practices, and training at the time." Defendants also argue that Dr. Gaut referenced Supreme Court cases and Illinois law in his expert report and that Ryan is merely rebutting this. That Dr. Gaut referenced legal authority in his expert report is not the same as Ryan opining as to outcome determinative legal conclusions.

As with Ryan's opinion testimony about probable cause, Ryan's legal interpretations and conclusions in which he opines that Defendants' conduct was consistent with "legal mandates" is not only outcome determinative as related to Sanders' constitutional claims, *see Roundy's Inc.,* 674 F.3d at 648, but these legal conclusions have the real potential of confusing or misleading the jury. *See Lupton,* 620 F.3d at 799-800; *Sanders v. City of Chicago Heights,* No. 13 C 0221, 2016 WL 1730608, at *8 (N.D. Ill. May 2, 2016). The Court, in its discretion, grants Sanders' *Daubert* motion in this respect.

## II. Reliability

The Court now turns to Sanders' argument that Ryan's opinion about the corruption in the Chicago Heights Police Department lacks a sufficient basis – which speaks to the reliability requirement under *Daubert* and Rule 703. *See Stuhlmacher,* 774 F.3d at 409 ("Expert testimony

15

is admissible at trial if the testimony is relevant to a fact in issue, is based on sufficient facts or data, and is the product of reliable scientific or other expert methods that are properly applied."); *see also Brown v. Burlington No. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) ("Rule 703 requires the expert to rely on 'facts or data,' as opposed to subjective impressions"). In determining reliability, a "critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data "only by the *ipse dixit* of the expert," that is properly excluded under Rule 702." *Manpower, Inc.*, 732 F.3d at 806 (quotation omitted). In other words, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah,* 332 F.3d 475, 478 (7th Cir. 2003).

In his motion, Sanders argues that Ryan merely states an opinion without any basis when he opined that the corruption within the Chicago Heights Police Department had "no evidentiary connection made in the materials provided to date with the investigation of Mr. Sanders." Simply put, Sanders is arguing that Ryan merely states a "bottom line" without linking his conclusion to facts or data. *See Zamecnik v. Indian Prairie Sch. Dist. No. 204,* 636 F.3d 874, 881 (7th Cir. 2011) ("Mere conclusions, without a 'hint of an inferential process,' are useless to the court.") (citation omitted). To explain, although it is common for experts to extrapolate opinions from existing data, the expert must make reliable inferences in doing so. *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.,* 395 F.3d 416, 420 (7th Cir. 2005) ("Reliable inferences depend on more than say-so.").

In response, Defendants do not explain how Ryan "connected the dots" from his research or the materials he relied upon to his conclusion that there was "no evidentiary connection"

16

between the Atkins investigation implicating Sanders and the corruption in the Chicago Heights Police Department. *See Wood,* 807 F.3d at 837. Indeed, as Ryan's deposition testimony reveals, he knew little about the corruption at the Chicago Heights Police Department at the time the Atkins murder investigation took place. (*See, e.g.,* R. 206, Ryan Dep. at 52-54, 220-23.) More importantly, he never articulates – at his deposition or in his expert report – how he came to the conclusion that there was "no evidentiary connection" between the murder investigation implicating Sanders and the corruption in the Chicago Heights Police Department. Without more, Ryan has not explained how he used his expertise to generate his conclusion. *See Zamecnik,* 636 F.3d at 881; *Obrycka v. City of Chicago,* 792 F. Supp. 2d 1013, 1025 (N.D. Ill. 2011). Accordingly, the Court, in its discretion, grants Sanders' *Daubert* motion as to this part of Ryan's expert opinion.

## CONCLUSION

For these reasons, the Court, in its discretion, grants in part and denies in part Plaintiff's *Daubert* motion to exclude Defendants' rebuttal witness John J. Ryan's expert testimony.

**Dated:** August 19, 2016

                                                **ENTERED**

                                                **AMY J. ST. EVE**
                                                **United States District Court Judge**